826 A.2d 486

**STATE of Maryland**

v.

**Richard Brandon GREEN.**

**No. 80, Sept. Term, 2002.**

Court of Appeals of Maryland.

June 17, 2003.

598

Kathryn Grill Graeff, Deputy Chief (J. Joseph Curran, Jr., Atty. Gen., on brief), Baltimore, for petitioner.

Nancy S. Forster, Deputy Public Defender (Stephen E. Harris, Public Defender, on brief), Baltimore, for respondent.

Argued before BELL, C.J., ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA, JJ.

BATTAGLIA, J.

The issue in this case is whether the Respondent, Richard Brandon Green, voluntarily consented to a police search of his vehicle after the completion of a routine traffic stop. During that search, the police officer discovered cocaine and marijuana, and Green later was convicted of possessing those substances in violation of Maryland Code, Article 27, § 286 (1957, 1996 Repl.Vol., 2000 Supp.) and Maryland Code, Article 27, § 287 (1957, 1996 Repl.Vol.). The Court of Special Appeals reversed Green's convictions, concluding that the drugs were discovered pursuant to an illegal police search. We now reverse that court's judgment and reinstate Green's convictions, holding that Green voluntarily consented to the police search that uncovered the evidence of marijuana and cocaine in his car.

## I. Background

### A. Facts

On March 26, 2000, at around 7:30 p.m., while on "stationary uniform patrol," Deputy Mark Meil of the Queen Anne's County Sheriff's Office noticed a 1999 model black Mercury that appeared to be traveling above the posted speed limit of 50 miles per hour on Route 302 in Queen Anne's County. Deputy Meil measured the car's speed with a radar device and determined that it was traveling at 65 miles per hour. Based on this excessive speed, the deputy activated his emergency lights and stopped the car, which was driven by Green. Deputy Meil approached Green, advised him that he had been stopped for speeding, requested to see his license and regis-

tration, and asked him "if he had any points on his license." Green responded that he did have points and handed over the documents. Deputy Meil then returned to the police car where he ran a check of Green's license and a "criminal check for any caution codes for officers' safety." He learned from "dispatch" that Green's license was valid, so the officer began walking back to Green's car to issue him a warning citation. As he was walking, police "communications" radioed to Deputy Meil that Green had "prior caution codes for armed and dangerous and . . . drugs."

When he arrived at Green's car, Deputy Meil issued the warning citation and returned the driver's license and registration. Deputy Meil then stated to Green that he was "free to go." After Green had received all of his documents and learned that he was free to leave, Deputy Meil asked Green if he would mind answering a few questions before leaving. Green replied, "Sure." Based on this positive response, Deputy Meil asked Green "if he had any guns, drugs or alcohol in the vehicle." Green answered, "No." He then asked Green "if he would consent to a search of his person and vehicle." Green responded, "Sure. Go ahead."

To ensure his safety, Deputy Meil requested that Green step out of the car. The officer explained that, based on what he had learned from the criminal check that Green could be armed and dangerous, he was not sure "whether there might be a hand gun in the vehicle." Also to ensure his safety, as he asked Green to step out of the car, Deputy Meil called for another officer to assist him by watching Green during the car search. Deputy Meil was concerned that, by himself, he would not be able to search the car and watch Green at the same time. He was concerned especially because of the "area," "it was extremely dark out," and Green was physically much larger than he with a "history of violence with hand guns."

While the deputy waited for the other officer to arrive, Green stepped out of the car. Deputy Meil frisked him for weapons, found none, and then scanned the open areas of the

car that were "in plain view" and saw no weapons or drugs. Green and the deputy walked to the front of Green's car and engaged in a "casual conversation." At this point, Deputy Meil explained to Green the reasons he had called for another officer. Deputy Meil stated that he was concerned for his safety because of the location and because he would be unable to search the car and watch Green simultaneously. The deputy further explained that the wait was taking so long because it was hard to find an available backup unit when the office was "short staffed."

Corporal Tim Riggleman responded to Deputy Meil's call for backup and arrived at the scene of the traffic stop approximately 15–20 minutes after being called. After parking his vehicle behind Deputy Meil's, Corporal Riggleman, who was armed and in uniform, got out of the car and approached Green and the deputy near the front of Green's car. He then watched Green while Deputy Meil searched the interior of Green's car. When Deputy Meil began his search, he immediately was directed to the center console by the driver's seat because of a faint odor of marijuana emanating from it. Opening the console, he discovered a "black zipper bag" with two pockets. Inside the top zippered portion, Deputy Meil found "two bags of green leafy substance, which [he] identified ... as marijuana." Deputy Meil then walked back to Green and Corporal Riggleman and arrested Green. Corporal Riggleman, after patting down Green, placed him in the back seat of Deputy Meil's vehicle. Meanwhile, Deputy Meil returned to Green's car to continue the search of the black bag, where, in another pocket, he found approximately 110 zipper bags and a "white rock-like substance of suspected cocaine."

## B. Procedural History

In the Circuit Court for Queen Anne's County, Green was charged with possession of cocaine and marijuana with intent to distribute in violation of Maryland Code, Article 27, § 286 (1957, 1996 Repl.Vol., 2000 Supp.),[1] and possession of cocaine

1. Maryland Code, Art. 27 § 286 states in relevant part:

and marijuana in violation of Maryland Code, Article 27, § 287 (1957, 1996 Repl. Vol).[2] Green filed a motion to suppress evidence of the cocaine and marijuana, claiming in part that it was obtained in violation of the Fourth Amendment's guarantee against unreasonable searches and seizures. On September 28, 2000, a hearing was held on the motion, during which the court heard testimony from Deputy Meil, Corporal Riggleman, and Green. The officers' testimony and most of Green's testimony recounted the facts as they have been presented.

Green, however, disputed that he had received his warning citation, license, and registration before Deputy Meil asked him for consent to search the car. He also claimed that, when

---

(a) *Prohibited conduct.*—Except as authorized by this subheading, it is unlawful for any person:

(1) To ... possess a controlled dangerous substance in sufficient quantity to reasonably indicate under all circumstances an intent to manufacture, distribute, or dispense, a controlled dangerous substance....

\* \* \*

(b) *Penalty.*—Any person who violates any of the provisions of subsection (a) of this section with respect to:

(1) A substance classified in Schedules I or II which is a narcotic drug is guilty of a felony and is subject to imprisonment for not more than 20 years, or a fine of not more than $25,000, or both.

Maryland Code, Art. 27 § 279(a)(3)(c)(7) (1957, 1996 Repl.Vol., 2000 Supp.) classifies "marihuana" as a Schedule I substance. Under Art. 27 § 279(b)(4), cocaine is classified as a Schedule II substance.

**2.** Maryland Code, Art. 27 § 287 states in relevant part:

Except as authorized by this subheading, it is unlawful for any person:

(a) To possess ... any controlled dangerous substance, unless such substance was obtained directly, or pursuant to a valid prescription or order from a practitioner, while acting in the course of his professional practice.

\* \* \*

(e) Any person who violates this section shall, upon conviction, be deemed guilty of a misdemeanor and be sentenced to a term of imprisonment for not more than four (4) years, a fine of not more than twenty-five thousand dollars ($25,000), or both; provided, however, that any such person convicted of a violation of this section involving the use or possession of marihuana shall be punished by a period of imprisonment not to exceed one (1) year or by a fine not to exceed $1,000.00, or both.

he was asked for consent, he refused, and then the officer stated, "You have to step out of the vehicle, sir." According to Green, Deputy Meil searched his person, searched his car, and only then called for backup. Green stated that he did not feel free to leave during the encounter because the officer maintained possession of his license and registration. Green, though, acknowledged in his testimony, that he never told Deputy Meil that he wanted to leave and that, in fact, he offered to open the trunk of his car for the officer during the search.

Following the testimony, the State argued that Green consented to the search of his car and, therefore, the subsequent seizure of the marijuana and cocaine did not violate the Fourth Amendment. Green responded that the police officer had illegally searched the car because he neither had valid consent to search nor reasonable articulable suspicion of criminal activity. The court, nonetheless, specifically found that Green had consented to the search. In orally issuing his ruling, the judge expressed doubt about the veracity of Green's version of the events that led to the discovery of the drugs, querying why, for example, Green would have offered to open the trunk of his car if "he had not consented [to the search] in the first place." His conclusion that Green consented to the search was "reinforced" by the fact that Green is "significantly larger in both height and build than the ... police officer" and "is not, as his testimony indicated, a bashful type." Rather, the judge found:

> He is fully aware of himself and where he is. That is, he gives an indication of great presence and it is very difficult for me to believe that all this, in fact it's impossible for me to believe that the situation could have occurred as [Green described] and at the same time he offered to use the trunk. So therefore, I'm compelled to conclude and I find as a fact that consent was actually given.

The court further stated that, "the State's Attorney is correct that ... consent ... was ... never withdrawn" because Green "was quite aware that he could leave ... and didn't seem to be terribly threatened by the situation and he seemed to be very

interested in assisting the police in what they were doing." Concluding that there was no illegal search, the judge denied the motion to suppress.

Green proceeded to trial on March 15, 2001. During the trial, Green and the State entered into an agreement under which the State would drop the cocaine distribution charge in exchange for Green allowing the court to decide his guilt based on an agreed statement of facts. Green was found guilty of possession of cocaine and possession of marijuana with intent to distribute for which Green was sentenced to consecutive terms of imprisonment of two years and four years, respectively.

A divided panel of the Court of Special Appeals reversed the convictions in *Green v. State*, 145 Md.App. 360, 802 A.2d 1130 (2002). The court held that the search of Green's car did not emanate from a consensual encounter but, rather, from an unlawful seizure. *Id.* at 398, 802 A.2d at 1152. Analytically, the court divided the entire episode into three separate components: (1) the initial traffic stop, (2) a second encounter that included Deputy Meil's pat-down of Green and cursory inspection of the vehicle, and (3) a third encounter, which encompassed all events following that initial inspection of the vehicle. *Id.* at 390, 802 A.2d at 1148. The validity of the initial traffic stop was not challenged and, according to the court, came to an end when the officer returned Green's license and registration and issued the warning citation. *Id.* With respect to the second encounter, the court chose not to resolve whether it was consensual because it regarded the third encounter as an illegal detention. *Id.* In the court's opinion, Green's consent to search ended after Deputy Meil frisked him and briefly scanned the open areas of the car. *Id.* at 392, 802 A.2d at 1149. The court held that, "[o]nce the back-up unit was called, a reasonable person in Green's situation would not have believed he could terminate the encounter," and "there was no evidence that Green consented to wait some fifteen or twenty minutes for the arrival of the back-up unit." *Id.* at 392–93, 802 A.2d at 1149. Therefore, the court concluded, the search that uncovered the illegal drugs "occurred well beyond the

period of any consent that [Green] may have given." *Id.* at 398, 802 A.2d at 1152.

Judge James Eyler dissented, believing that Green voluntarily consented to the search of his vehicle. *Id.* at 398, 802 A.2d at 1152–53 (Eyler, J., dissenting). He stated:

> In the case before us, there was one officer; [Green] was advised that he was free to go after his documents had been returned to him; and [Green] consented while he was in his vehicle, before the officer called for backup, thus consenting prior to any action by the officer. There was no coercive behavior, and the consent was never withdrawn.

*Id.* at 398–99, 802 A.2d at 1152–53.

We granted the State's petition for a writ of certiorari, *State v. Green,* 371 Md. 613, 810 A.2d 961 (2002), to answer a single question,[3] which we have divided and rephrased to clarify the issues in this case:

1. Did Green voluntarily consent to the search of his car following a traffic stop when Deputy Meil returned Green's license and registration, told him he was "free to go," asked him if he could search the car, and then Green responded, "Sure. Go ahead."?

2. Did Green's consent remain valid throughout the entirety of his encounter with Deputy Meil, including during the search that uncovered illegal drugs?

We hold that Green voluntarily consented to the search of his car and that his consent remained valid during Deputy Meil's search of the car that uncovered illegal drugs. Consequently, the search did not violate the Fourth Amendment. Accordingly, we reverse the judgment of the Court of Special Appeals.

---

3. The State posed the following question in its petition: "Did the Court of Special Appeals err in finding that the interior search of Green's car violated the Fourth Amendment where that search was conducted pursuant to Green's consent and where consent was never withdrawn?"

## II. Standard of Review

The ultimate burden of proving that evidence seized without a warrant should not be suppressed falls on the State. *State v. Bell,* 334 Md. 178, 191, 638 A.2d 107, 114 (1994). In reviewing a Circuit Court's grant or denial of a motion to suppress evidence under the Fourth Amendment, we ordinarily consider only the information contained in the record of the suppression hearing and not the trial record. *Dashiell v. State,* 374 Md. 85, 93, 821 A.2d 372, 376 (2003)(quoting *State v. Collins,* 367 Md. 700, 706–08, 790 A.2d 660, 663–64 (2002) (citing *Ferris v. State,* 355 Md. 356, 368, 735 A.2d 491, 497 (1999)). Where, as here, the motion to suppress was denied, we view the facts in the record in the light most favorable to the State, the prevailing party on the motion. *Dashiell,* 374 at 93, 821 A.2d at 376–77 (quoting *Collins,* 367 Md. at 707, 790 A.2d at 664)(citing *Riddick v. State,* 319 Md. 180, 183, 571 A.2d 1239, 1240 (1990)). With respect to weighing and determining first-level facts (such as the number of officers at the scene, the time of day, whether certain words were spoken, etc.), we extend great deference to the fact-finding of the suppression hearing judge. *Dashiell,* 374 Md. at 93, 821 A.2d at 377 (quoting *Collins,* 367 Md. at 707, 790 A.2d at 664) (citing *Lancaster v. State,* 86 Md.App. 74, 95, 585 A.2d 274, 284 (1991)). Therefore, " '[w]hen conflicting evidence is presented, we accept the facts as found by the hearing judge unless it is shown that his findings are clearly erroneous.' " *Dashiell,* 374 Md. at 93, 821 A.2d at 377 (quoting *Collins,* 367 Md. at 707, 790 A.2d at 664)(citing *McMillian v. State,* 325 Md. 272, 281–82, 600 A.2d 430, 435 (1992))). As to the ultimate conclusion of whether there was a Fourth Amendment violation, however, "we must make our own independent constitutional appraisal by reviewing the law and applying it to the facts of the case." *See Collins,* 367 Md. at 707, 790 A.2d at 664 (citing *Riddick,* 319 Md. at 183, 571 A.2d at 1240).

## III. Discussion

The State avows that the Court of Special Appeals erred in holding that "the interior search of Green's car violated the

Fourth Amendment." The Fourth Amendment, under the State's view, does not apply in this case because Deputy Meil did not detain Green after he concluded the traffic stop by returning his license and registration and advising him that he was "free to go." Rather, according to the State, Green willingly remained at the scene of the traffic stop, and Deputy Meil conducted the car search pursuant to Green's voluntary consent. The State further takes issue with the intermediate appellate court's conclusion that the search that uncovered the illegal drugs "exceeded the temporal scope of Green's consent." It contends, instead, that Green's consent "embraced" the 15 to 20 minutes that elapsed while Green and Deputy Meil waited for the assisting officer to arrive.

Green's argument, not surprisingly, follows much of the analysis of the Court of Special Appeals in this case. He maintains that, after the completion of the purpose of the traffic stop, his encounters with Deputy Meil were not consensual but illegal detentions procured by coercive police conduct. Alternatively, Green argues that even if his consent was given voluntarily, it was limited to allowing the officer to conduct the pat-down search and visual inspection of the inside of the car. According to Green, the officer's search of the car 15 to 20 minutes later exceeded the scope of any consent. For the reasons stated below, we disagree.

### A.

■ The Fourth Amendment to the United States Constitution protects against unreasonable government searches and seizures. It provides in part: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated...." The guarantees of the Fourth Amendment apply to the States through the operation of the Fourteenth Amendment to the United State Constitution. *See Mapp v. Ohio*, 367 U.S. 643, 655, 81 S.Ct. 1684, 1691, 6 L.Ed.2d 1081, 1090 (1961); *Dashiell*, 374 Md. at 94, 821 A.2d at 377; *Owens v. State*, 322 Md. 616, 622, 589 A.2d 59, 61 *cert. denied*, 502 U.S. 973, 112 S.Ct. 452, 116 L.Ed.2d 470 (1991).

An individual is not "seized" within the meaning of the Fourth Amendment if he engages in a consensual encounter with police. *Ferris*, 355 Md. at 373 n. 4, 735 A.2d at 500 n. 4 (citing *United States v. Werking*, 915 F.2d 1404, 1408 (10th Cir.1990)). For instance, "[l]aw enforcement officers do not violate the Fourth Amendment[ ] . . . merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen." *United States v. Drayton*, 536 U.S. 194, 200, 122 S.Ct. 2105, 2110, 153 L.Ed.2d 242, 251 (2002). As long as police officers do not "induce cooperation by coercive means," they may "pose questions, ask for identification, and request consent to search luggage" even if they have no basis for suspecting that a particular individual has engaged in criminal activity. *Id.* at 201, 122 S.Ct. at 2110, 153 L.Ed.2d at 251. Where an individual's encounter with police is purely consensual, "no privacy interests [are] invaded and thus the Fourth Amendment is not implicated." *Ferris*, 355 Md. at 375, 735 A.2d at 501. Consistent with these principles, the Supreme Court has "long approved consensual searches because it is no doubt reasonable for the police to conduct a search once they have been permitted to do so." *Florida v. Jimeno*, 500 U.S. 248, 250–51, 111 S.Ct. 1801, 1803, 114 L.Ed.2d 297, 302 (1991) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854, 858 (1973)).

Unlike such consensual encounters, the brief detention of a motorist resulting from a traffic stop does implicate the Fourth Amendment. *See United States v. Sharpe*, 470 U.S. 675, 682, 105 S.Ct. 1568, 1573, 84 L.Ed.2d 605, 613 (1985); *Ferris*, 355 Md. at 369, 735 A.2d at 497. Nevertheless, when a police officer has probable cause to believe that a driver has broken a traffic law, the officer may detain the driver temporarily "to enforce the laws of the roadway, and ordinarily to investigate the manner of driving with intent to issue a citation or warning." *Ferris*, 355 Md. at 369, 372, 735 A.2d at 497–98, 499 (citing *Whren v. United States*, 517 U.S. 806, 810, 116 S.Ct. 1769, 1772, 135 L.Ed.2d 89, 95 (1996)). This detention, however, must "last no longer than is neces-

sary to effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229, 238 (1983) (plurality opinion); *Ferris*, 355 Md. at 369, 735 A.2d at 498.

 Judge Raker, speaking for this Court, has drawn a bright line, demarcating the point at which an ordinary traffic stop ends:

> In sum, the officer's purpose in an ordinary traffic stop is to enforce the laws of the roadway, and ordinarily to investigate the manner of driving with the intent to issue a citation or warning. Once the purpose of that stop has been fulfilled, the continued detention of the car and the occupants amounts to a second detention. *See Royer*, 460 U.S. at 500, 103 S.Ct. at 1325–26. Thus, once the underlying basis for the initial traffic stop has concluded, a police-driver encounter which implicates the Fourth Amendment is constitutionally permissible only if either (1) the driver consents to the continuing intrusion or (2) the officer has, at a minimum, a reasonable, articulable suspicion that criminal activity is afoot. *United States v. Sandoval*, 29 F.3d 537, 540 (10th Cir.1994).

355 Md. at 372, 735 A.2d at 499. This language clarifies that, after a traffic citation or warning has been issued, the Fourth Amendment allows only (1) consensual encounters between the police officer and driver, and (2) detentions supported by, at least, reasonable articulable suspicion. In the case before us, the State contends that the encounter between Deputy Meil and Green continued after the citation was issued only because Green had consented.

 "The Fourth Amendment test for a valid consent to search is that the consent be voluntary...." *Ohio v. Robinette*, 519 U.S. 33, 40, 117 S.Ct. 417, 421, 136 L.Ed.2d 347, 355 (1996). Voluntariness turns on " 'whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter.' " *Drayton*, 536 U.S. at 202, 122 S.Ct. at 2111, 153 L.Ed.2d at 252 (quoting *Florida v. Bostick*, 501 U.S. 429, 436, 111 S.Ct. 2382, 2387, 115 L.Ed.2d

389, 400 (1991)); *See Ferris,* 355 Md. at 375, 735 A.2d at 501 ("The test to determine whether a particular encounter constitutes a seizure, or whether the encounter was simply a 'consensual' non-constitutional event is whether a reasonable person would have felt free to leave."). "If a reasonable person would feel free to terminate the encounter, then he or she has not been seized," but, rather, has engaged in a consensual encounter. *Drayton,* 536 U.S. at 201, 122 S.Ct. at 2110, 153 L.Ed.2d at 251. Whether one consented voluntarily " 'is a question of fact to be determined from all circumstances.' " *Robinette,* 519 U.S. at 40, 117 S.Ct. at 421, 136 L.Ed.2d at 355 (quoting *Schneckloth,* 412 U.S. at 248–49, 93 S.Ct. at 2059, 36 L.Ed.2d at 875); *McMillian v. State,* 325 Md. 272, 285, 600 A.2d 430, 436 (1992).

The Supreme Court, in *United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), provided several examples of circumstances that tend to indicate that there has been a seizure under the Fourth Amendment:

> Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. In the absence of some such evidence, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person.

*Id.* at 554–55, 100 S.Ct. at 1877, 64 L.Ed.2d at 509–10 (citations omitted).

To understand the distinctions between consensual encounters and Fourth Amendment seizures, we draw further guidance from our opinion in *Ferris,* which discussed the subject in detail. 355 Md. 356, 735 A.2d 491 (1999). In *Ferris,* we reversed the denial of a motion to suppress, holding that a police officer had violated the Fourth Amendment by detaining a driver, without his valid consent, or reasonable articula-

ble suspicion, after the completion of a routine traffic stop. *Id.* at 377, 387, 393, 735 A.2d at 502, 507, 511. The police officer in that case, Trooper Smith, clocked Ferris's car traveling above the posted speed limit. *Id.* at 362, 735 A.2d at 494. The officer stopped Ferris, who was carrying one passenger, obtained Ferris's driver's license and registration, and returned to his patrol car to conduct a license and outstanding warrant check. *Id.* While the officer was writing out the traffic citation, another officer arrived on the scene, parking his car behind Trooper Smith's. *Id.* The two officers then walked to Ferris's car, and Trooper Smith returned the driver's license and registration along with a copy of the citation. *Id.* at 363, 735 A.2d at 494. Without informing Ferris that he was free to leave, Trooper Smith "asked him if he would mind stepping to the back of his vehicle to answer a couple of questions." *Id.* Ferris agreed, accompanying the trooper to the rear of his (Ferris's) car. *Id.* While behind the car, Trooper Smith asked Ferris repeatedly whether he "smoked any drugs" because Ferris's eyes appeared bloodshot and he did not have the scent of alcohol on his breath. *Id.* at 363–64, 735 A.2d at 495. Ferris eventually admitted that he had smoked a "joint" several hours earlier and that his traveling companion possessed a small amount of marijuana. *Id.* at 364, 735 A.2d at 495. After Trooper Smith questioned Ferris's passenger and recovered a small baggie of marijuana, he searched Ferris's car. *Id.* The search revealed a book bag on the back seat of the car, inside of which the trooper found a large quantity of marijuana. *Id.* The Court of Special Appeals affirmed the denial of Ferris's motion to suppress the marijuana. *Id.* at 366–67, 735 A.2d at 496. We reversed. *Id.* at 393, 735 A.2d at 511.

In analyzing the police-driver encounter in *Ferris,* we first determined that the officer fulfilled the purpose of the traffic stop when he delivered the citation and returned Ferris's license and registration. *Id.* at 373, 735 A.2d at 500. The more difficult question in *Ferris,* however, similar to the question posed in the present case, was "whether Trooper Smith's questioning of [Ferris] after he had issued the traffic

citation and had returned [Ferris's documents] constituted a detention, or seizure, and hence raise[d] any Fourth Amendment concerns, or was merely a 'consensual encounter,' thus implicating no constitutional overview." *Id.* at 373–74, 735 A.2d at 500 (footnotes omitted). To help us with this question, which we described as "highly fact-specific," we compiled a list of factors that courts have found useful in determining whether an individual's encounter with police was consensual:

> These factors include: the time and place of the encounter, the number of officers present and whether they were uniformed, whether the police removed the person to a different location or isolated him or her from others, whether the person was informed that he or she was free to leave, whether the police indicated that the person was suspected of a crime, whether the police retained the person's documents, and whether the police exhibited threatening behavior or physical contact that would suggest to a reasonable person that he or she was not free to leave.

*Id.* at 377, 735 A.2d at 502.

The application of these factors to the circumstances in *Ferris* persuaded us that "Trooper Smith's prolonged encounter with Ferris was a seizure under the Fourth Amendment." *Id.* at 378, 735 A.2d at 502. We began our analysis of the facts by noting that the "pre-existing [traffic detention] enhanced the coercive nature of the situation and the efficacy of the other factors in pointing toward the restriction of Ferris's liberty." *Id.* at 378, 735 A.2d at 502. Other factors we found significant include the following:

> the trooper never told Ferris he was free to leave, the trooper's "request" of Ferris to exit the vehicle seemlessly followed the pre-existing lawful detention, the trooper removed Ferris from his automobile, the trooper separated Ferris from the passenger, there were two uniformed law enforcement officers present, the police cruiser emergency flashers remained operative throughout the entire encounter, and it was 1:30 a.m. on a dark, rural interstate highway.

*Id.* at 378–79, 735 A.2d at 502–03. We emphasized that no single one of these circumstances, standing alone, would have compelled a conclusion that Ferris was seized. *Id.* at 384, 735 A.2d at 506. Nevertheless, "[g]iven the cumulative effect of these circumstances," we held, "a reasonable person would not have felt free to terminate the encounter." *Id.* at 379, 735 A.2d at 503.

In the case *sub judice*, like in *Ferris*, the parties do not dispute that Deputy Meil stopped Green because he had probable cause to believe he had violated the law by exceeding the posted speed limit. They also agree that no Fourth Amendment violation occurred while the officer carried out the purpose of the traffic stop. Their views diverge, however, regarding the character of the encounter between Deputy Meil and Green after the warning citation had been issued and the purpose of the traffic stop had been fulfilled. Green contends that, although he responded, "Sure. Go ahead" when the officer asked for consent to search the car, he did not offer this consent voluntarily as required by the Supreme Court's and this Court's Fourth Amendment jurisprudence. On the other hand, the State regards Green's consent as voluntary because, it argues, a reasonable person in Green's position would have felt free to decline the officer's request to search the car. We must determine, therefore, whether the officer obtained Green's voluntary consent or induced his cooperation by coercive means.

The *Ferris* factors guide our analysis here. At the outset, we note the single similarity in the present case and *Ferris* that weighs in favor of Green's argument: the encounters at issue in both cases arose from pre-existing seizures in the form of traffic stops. We recognize, as we did in *Ferris*, that in this regard, the setting in the present case differs markedly from an encounter between a police officer and passer-by on a public sidewalk or other inherently less intimidating scenario. Nevertheless, *Ferris* makes clear that our determination of voluntariness cannot turn on this single factor. *See Ferris*, 355 Md. at 384, 735 A.2d at 506 (stating that "no single circumstance [in that case] would have transformed the en-

counter into a Fourth Amendment seizure"). We must, instead, examine the totality of the circumstances.

The balance of the *Ferris* factors, when applied to the present circumstances, combine to compel a conclusion that a reasonable person in Green's position would have felt free to terminate the encounter and decline Deputy Meil's request to search his car. The encounter between Deputy Meil and Green occurred at 7:30 p.m., during the evening, which is differentiated from the 1:30 a.m. stop that occurred in *Ferris*. The Court of Special Appeals, however, to bring this case within the *Ferris* rationale, emphasizes Deputy Meil's testimony that "he was 'worried,' and called for backup, in part because of the 'area and location' of the stop and because it was 'extremely dark out.'" 145 Md.App. at 395, 802 A.2d at 1151. The officer's concern for his safety did not arise solely from the setting of the stop, however. The darkness and area of the stop merely added to the officer's cautiousness, which had as much to do with Green's relatively large physical presence [4] and asserted history of hand gun violence. In any event, the focus of our voluntariness determination should be placed on a reasonable motorist's impression of the setting and not on the officer's subjective view of the conditions. *See Drayton*, 536 U.S. at 202, 122 S.Ct. at 2111, 153 L.Ed.2d at

---

4. The Court of Special Appeals dismissed the comparative size differences of Green and Deputy Meil, emphasizing instead that the "trooper" was armed, "although his weapon was not drawn." 145 Md.App. at 395, 802 A.2d at 1151. Our review of the suppression hearing record reveals evidence only that Corporal Riggleman was armed during the encounter. Although whether an officer is armed can be a relevant factor, the fact that Corporal Riggleman was armed has no bearing on the consensual nature of the encounter in this case. He did not arrive on the scene until 15–20 minutes after Green had agreed to allow the search, and when he did arrive, he did not brandish his weapon or behave in a manner that changed the encounter from consensual to coercive. Similarly, even if Deputy Meil also had been armed, which is likely, the fact that he was uniformed and carried a holstered sidearm would not have affected the voluntariness of Green's consent. *See Drayton*, 536 U.S. at 205, 122 S.Ct. at 2112, 153 L.Ed.2d at 254 ("That most law enforcement officers are armed is a fact well known to the public. The presence of a holstered firearm thus is unlikely to contribute to the coerciveness of the encounter absent active brandishing of the weapon.").

252 (instructing that voluntariness turns on " 'whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter' ")(quoting *Florida v. Bostick,* 501 U.S. 429, 436, 111 S.Ct. 2382, 2387, 115 L.Ed.2d 389, 400 (1991)); *Ferris,* 355 Md. at 375, 735 A.2d at 501 (stating that the "test" for whether an encounter was a seizure or consensual is "whether a reasonable person would have felt free to leave"). Absent coercive circumstances, we conclude that a reasonable person would have felt free to terminate the police encounter in this case despite the time and place of the traffic stop.

The other circumstances relevant in *Ferris* also weigh in favor of the State in this case. For example, Deputy Meil had returned Green's documents and delivered the warning citation before requesting consent, so Green, as the officer stated, was actually "free to go" without having to leave anything behind. Further, unlike in *Ferris* where two officers were present before the initial traffic stop ended, Deputy Meil was the only officer at the scene when he completed the traffic encounter and then asked Green for permission to search his person and car. Although Corporal Riggleman eventually arrived, he did so within 15–20 minutes after Green had consented to a search. The corporal's presence had no impact on Green's decision to allow a prolonged encounter. Nor did his presence alter the consensual nature of the prolonged encounter.

Additionally, we identified no evidence suggesting that Deputy Meil or Corporal Riggleman demonstrated threatening behavior toward Green. To the contrary, Deputy Meil asked, instead of ordered, Green to step out of the car and then engaged in a "casual conversation" with him as they waited for additional officer assistance. *See Burgos–Seberos v. State,* 969 P.2d 1131, 1134–35 (Wyo.1998) (recognizing that the generally cooperative tenor of the police-driver encounter, during which the driver and officers engaged in a "casual conversation," weighed in favor of a determination of voluntary consent). During the conversation in which he informed Green that backup had been called, he explained that the purpose of the

call was to ensure the deputy's safety "given the location of the area." He further explained that the additional officer was needed because he could not search the car and watch Green at the same time.[5]

The Court of Special Appeals relied on this same conversation, however, stating that, "although the deputy never told appellant that he was under investigation for criminal misconduct, calling for back-up would generally signal to a reasonable person that the continuation of the encounter is not really a matter of choice." 145 Md.App. at 394, 802 A.2d at 1150. We do not find this reasoning persuasive. A thorough search of the car required more than a quick flashlight inspection of the "open areas ... in plain view." If conducted alone, Deputy Meil would have needed to turn his back on Green and leave himself vulnerable to the uncertain behavior of one that the deputy believed had a past of violent criminal conduct. Such circumstances warranted, if not compelled, Deputy Meil's call for back up. As we mentioned above, Deputy Meil explained to Green his reasons for seeking assistance, and those reasons included neither investigating Green's involvement in a crime nor putting Green in custody. Once Green had agreed to allow Deputy Meil to search the car, he reasonably should have expected to experience the type of search that ultimately led to the discovery of the illegal drugs. That Deputy Meil called for back-up as a safety measure did not suddenly transform the consensual encounter into a seizure.

The most convincing circumstance in this case is that Deputy Meil, after returning Green's documents and issuing the citation but before asking Green's permission to prolong the encounter, specifically advised Green that he was "free to go." Although the Supreme Court has held that such advice is not

---

**5.** Green's own testimony supports our position that the nature of this encounter was non-threatening and cooperative. According to that testimony, while Deputy Meil was searching the passenger compartment, Green volunteered to open the car trunk. It is doubtful that Green would have made such an offer if the search was taking place completely against his will.

required following a traffic stop to obtain a driver's voluntarily consent to search the vehicle, *Robinette,* 519 U.S. at 39–40, 117 S.Ct. at 421, 136 L.Ed.2d at 355 (stating that it would "be unrealistic to require police officers to always inform detainees that they are free to go before a consent to search may be deemed voluntary"), this Court in *Ferris* deemed "the failure by law enforcement to inform a citizen that he or she is free to terminate the encounter" to be a "significant factor suggesting a continued seizure under the Fourth Amendment." 355 Md. at 380, 735 A.2d at 504. Also in *Ferris,* we implied that the trooper's failure to advise the driver he was free to go "imperil[led] the constitutional validity" of his continued encounter. 355 Md. at 381, 735 A.2d at 504. In the case before us, however, Deputy Meil avoided a potential constitutional pitfall by advising Green of his freedom to leave the scene and thus terminate the encounter.

Deputy Meil's advice to Green that he was free to leave also weighs significantly in our consideration of whether the officer's request for consent "seamlessly followed the pre-existing lawful detention." *Id.* at 378, 735 A.2d at 503. Unlike in *Ferris,* where the trooper returned the driver's document and then immediately requested that he leave the vehicle, Deputy Meil clearly communicated that the traffic stop had ceased before seeking to prolong the encounter. Moreover, Deputy Meil's initial request following the end of the lawful seizure was not a request to "exit the vehicle," which might appear to the driver to be coercive and intrusive. Instead, the officer here initially asked a much less threatening question, that being, if Green would mind answering a few questions. Given this less threatening preliminary request as well as the officer's clear statement that Green was free to leave, a reasonable motorist would have "believed that the initial, valid seizure had concluded." *Id.* at 379, 735 A.2d at 503. *See also Commonwealth v. Strickler,* 563 Pa. 47, 757 A.2d 884, 901 (2000) (determining that the absence of a clear endpoint to a detention did not preclude the conclusion that subsequent consent was voluntary).

Green maintains, nonetheless, that we should assign little significance to Deputy Meil's statement that Green was "free to go." To do otherwise, he suggests, would be to "ignore[ ] not only the circumstances surrounding the declaration ... but also the precise nature of the questions that immediately followed." In support of this assertion, Green asks us to heed the dictates of *State v. Retherford*, 93 Ohio App.3d 586, 639 N.E.2d 498 (1994). In that case, the Court of Appeals of Ohio, an intermediate appellate court, held that Retherford had not consented voluntarily to a post-traffic stop search of her car, even though an officer had told her that she was "free to go." *Id.* at 509. After stopping Retherford for speeding, the officer took her license and registration and returned to the police vehicle to write a citation. *Id.* at 501. While writing the citation, a back-up officer soon arrived on the scene. *Id.* In the presence of both officers, Retherford was asked to get out of her vehicle, and she complied. *Id.* One officer then returned Retherford's driver's license and registration, issued the traffic citation, and told her that she was "free to go." *Id.* As soon as she took one step back to her vehicle, the officer asked for permission to ask her another question. When Retherford replied, "Sure," the officer asked if she was carrying "large sums of money, drugs, or any weapons." Retherford's negative response prompted the officer's request to search her vehicle "to be sure there is no contraband...." *Id.* Retherford stated, "Sure, go ahead." The subsequent search of the car and its contents turned up illegal drugs. *Id.* at 501–02.

In reversing the trial court's denial of Retherford's motion to suppress and holding that the Retherford's prolonged police encounter was a "seizure," the court stated:

> We think it strains credulity to imagine that any citizen, directly on the heels of having been pulled over to the side of the road by armed and uniformed police officers in marked patrol cars, would ever feel "free to leave" or "at liberty to ignore the police presence and go about his business," in spite of being told otherwise, when she is then asked investigatory questions by the officers and faced with

a request to search her vehicle for contraband. We think that no reasonable person subjected to a traffic stop would feel free to walk away at any time when she is questioned about and confronted with the suspicion of drug trafficking. *Id.* at 507. The court concluded, therefore, that the officer's statement that Retherford was free to go did not convert the initial seizure for a traffic violation into a consensual encounter because the officer "immediately focused a new investigation on Retherford not reasonably related to the purpose of the initial stop." *Id.* at 599, 639 N.E.2d 498.

The analysis in *Retherford* does not fit the instant case. First, as *Ferris* demonstrates, this Court's interpretation of the Fourth Amendment conflicts with the *Retherford* court's broad statement that no reasonable person would feel free to terminate a post-traffic stop police encounter where the individual is questioned about possible possession of contraband. Such a proposition does not account for the numerous factors set forth in *Ferris* that must be considered in their totality.

Furthermore, in *Retherford,* the individual agreed to the search in the presence of two officers and after she had been instructed to get out of her car. Under those circumstances, advising one that she is free to go might not be in sync with reality. In the present case, however, Deputy Meil, the lone officer on the scene, told Green that he was free to leave while Green remained in the car, sitting in the driver's seat.

In conclusion, our analysis of the totality of the circumstances in this case leads us to conclude that Green voluntarily consented to prolonging the police encounter beyond the lawful traffic stop. In other words, a reasonable person in Green's position would have felt free to terminate the encounter and decline Deputy Meil's request to search the car. Therefore, when Green allowed Deputy Meil to search the car, he had not been seized within the meaning of the Fourth Amendment.

## B.

 Green maintains that the consent he gave to search his car expired at some point during the 15 to 20 minutes that

Green and the officer waited for additional officer assistance. Under Green's view, the search that uncovered the illegal drugs, which occurred after the second officer arrived, took place outside the scope of his consent, and the fruits derived therefrom should have been suppressed. We disagree.

■■■■■ As the Supreme Court described in *Florida v. Jimeno*, "[t]he standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" 500 U.S. at 251, 111 S.Ct. at 1803–04, 114 L.Ed.2d at 302. Like in our discussion above, determining what is reasonable requires a factual analysis, "examining the totality of the circumstances." *Robinette*, 519 U.S. at 39, 117 S.Ct. at 421, 136 L.Ed.2d at 354.

Although neither the Supreme Court nor this Court has applied the reasonableness analysis to define the temporal limits of one's consent, several other authorities provide useful guidance. For example, in *Gray v. State*, 441 A.2d 209, 221 (Del.1981), the Delaware Supreme Court concluded that an individual's consent to search certain articles of his, particularly a watch, remained valid even though the consent was given about 20 hours before the items were actually searched. *Id.* at 222. Underscoring that the temporal scope of consent depends on the facts and circumstances of each case, the court explained, "The length of time a consent lasts depends upon the reasonableness of the lapse of time between the consent and the search in relation to the scope and breadth of the consent given." *Id.* at 221. It further stated, "A brief 'lapse of time between the consent and the search does not require a reaffirmation of the consent as a condition precedent to a lawful search.'" *Id. (quoting State v. Koucoules*, 343 A.2d 860, 872 (Me.1974)). The authorities in that case were able to justify the 20–hour delay because they had to first attend to other investigative tasks and knew that the watch was safe. *Id.* at 222. Based on those circumstances, the court held that the 20–hour period between the proffered consent and search

was reasonable. *Id.; see also McNair v. Commonwealth,* 31 Va.App. 76, 521 S.E.2d 303, 308 (1999) (en banc) (holding that "[o]nce valid consent is given, the police may conduct a reasonable search of a residence until the consent is unequivocally withdrawn"); *State v. Grega,* 168 Vt. 363, 721 A.2d 445, 452 (1998) (holding that individual's consent to search his condominium had not expired even though consent was given two days prior to the final police search).

In *People v. Sanchez,* 292 Ill.App.3d 763, 226 Ill.Dec. 737, 686 N.E.2d 367, 373 (1997), the court held that a 40–minute roadside wait for police assistance was reasonable, and, therefore, the search that followed did not exceed the driver's consent. After being stopped for speeding and receiving a warning citation, the driver in *Sanchez* agreed to allow a search of his vehicle. *Id.* at 369. The officer then told the driver that he had called for a canine unit, which was on its way. *Id.* After waiting inside his vehicle for about 15 minutes the driver approached the officer and asked him if there was a problem. *Id.* The officer explained that there was no problem and that the canine unit would arrive shortly because it had been delayed. *Id.* at 369–70. When the canine unit arrived, 40 minutes after the driver had consented, it conducted a search of the vehicle and discovered illegal drugs. *Id.* at 370. On appeal of the trial court's denial of a motion to suppress evidence, the defendant argued that the discovery of the drugs occurred during a search that fell outside the scope of any consent. *Id.* at 372. Applying the rule that a " 'consent to search which is unlimited as to time and number of searches must be judged [according to] whether the search is reasonable,' " the court rejected the defendant's argument. *Id.* at 372 (*quoting People v. Mendoza,* 599 N.E.2d 1375, 1383 (1992)). It held:

> We agree with the trial court that the 40–minute delay in this case was reasonable. There was a rational explanation for the delay, the canine unit was held up while it responded to another request for assistance. Furthermore, [the officer] informed the driver on two occasions that he was

waiting for the canine unit so he could begin the search. The record reveals that neither the driver nor any occupants of the [vehicle] objected to the delay. Accordingly, we find no error.

*Id.* at 373 (citations omitted).

Finally, in *State v. Williams,* 67 N.C.App. 519, 313 S.E.2d 236, 237–38 (1984), the court held that police had not exceeded the temporal scope of an individual's consent where the search took place 23 hours after consent was given. Citing *Gray, supra,* the court measured the reasonableness of the search in light of all the circumstances. *Id.* at 237. Because the consent to search contained no limitations on the time of the search, the individual never withdrew the consent, and the officers were engaged in other relevant investigation during the 23–hour time lapse, the court concluded that "the search was conducted with reasonable expedition" and did not exceed the duration of the individual's consent. *Id.* at 237–38.

Compared to the cases in which courts have determined that an individual's consent had remained valid despite the passage of hours or days, the 15–20 minutes at issue in the case at bar seems entirely reasonable. This is especially true considering the various circumstances that warranted such a time lapse between Green's consent and Deputy Meil's discovery of the drugs. Deputy Meil did not immediately search the inside of Green's car because he feared what might happen should he divert his attention from Green to conduct a thorough search. The deputy recently had learned that Green, who is considerably larger than him, had a criminal past and might be armed and dangerous. It would have been wholly irresponsible and foolish of Deputy Meil to turn his back on Green for the search when, in a mere 15–20 minutes, another officer would arrive to assist him. Given that other officers were in short supply that day, a rational explanation for delay, the 15–20 minutes between the consent and search does not exceed what this Court considers reasonable. Had Green expressed a desire to revoke his consent or terminate the

encounter, our conclusion might be different.[6] He did not, so, based on all the circumstances, we decline to invalidate Green's consent because of the passage of 15–20 minutes.

## III. Conclusion

Green voluntarily consented to the search of his car, and that consent was not revoked nor did it expire. Thus, the search during which Deputy Meil discovered the cocaine and marijuana did not violate the Fourth Amendment.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO AFFIRM THE JUDGMENT OF THE CIRCUIT COURT FOR QUEEN ANNE'S COUNTY. COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY RESPONDENT.*

Dissenting Opinion by BELL, C.J. and ELDRIDGE, J.

BELL, C. J., and ELDRIDGE, J., dissenting.

We would affirm the judgment of the Court of Special Appeals for the reasons set forth in Judge Hollander's opinion for that court, *Green v. State,* 145 Md.App. 360, 802 A.2d 1130 (2002).

---

**6.** Recently, in a different but analogous context, we suggested that, under the Fourth Amendment, once an individual has lost his expectation of privacy in certain property, the individual regains that expectation of privacy only by some subsequent action. *Wallace v. State,* 373 Md. 69, 95, 816 A.2d 883, 899 (2003). In *Wallace,* we considered whether an inmate had maintained an expectation of privacy in his clothing that the police had taken into custody after his arrest and then searched 10 days later. *Id.* We held that the inmate lost and never regained an expectation of privacy in the property. *Id.* We stated: "Once the expectation of privacy is lawfully lost, it does not exist, unless such an expectation arises again by some subsequent action." *Id.* In the case before us, Green lost his expectation of privacy in the inside of the car when he consented to the search, and he never took subsequent action to regain that expectation of privacy.