*George Varriale v. State*, No. 85, September Term 2014, Opinion by Greene, J.


**CRIMINAL LAW – SEARCH AND SEIZURE – CONSENT TO SEARCH – SUBSEQUENT USE OF DNA**

The use of a buccal swab inside a person's cheek to obtain DNA samples for testing is a search. Generally, a DNA sample may be obtained from an individual for testing by consent, pursuant to a warrant, or other court order. If a person's DNA profile created from a DNA sample is in the lawful possession of the police for examination by consent and does not exceed the scope of the consent given to conduct the search, there is no Fourth Amendment violation. Moreover, the subsequent examination and use of the DNA in an unrelated investigation is not a search. Here, the defendant did not expressly limit the testing and/or use of his DNA. Any legitimate expectation of privacy that Varriale had in the identifying information contained in his DNA obtained from his cheek cells and penile area evaporated when his DNA was lawfully seized; it did not reappear when law enforcement officers compared his DNA sample to other samples and obtained a match.

IN THE COURT OF APPEALS
OF MARYLAND

No. 85
September Term, 2014

GEORGE VARRIALE

v.

STATE OF MARYLAND

Barbera, C.J.,
*Harrell,
Battaglia,
Greene,
Adkins,
McDonald,
Watts,

JJ.

Opinion by Greene, J.
Watts, J., joins in judgment only.
Harrell and Adkins, JJ., dissent.

Filed: August 11, 2015

*Harrell, J., now retired, participated in the hearing
and conference of this case while an active member
of this Court; after being recalled pursuant to the
Constitution, Article IV, Section 3A, he also
participated in the decision and adoption of this
opinion.

In this case, we address whether the subsequent use of a suspect's DNA profile,[1] created from a voluntarily provided DNA sample as part of a criminal investigation, implicates Fourth Amendment principles, where a comparison search of the DNA database reveals a match to forensic evidence obtained from the scene of an earlier, unrelated crime. In 2012, Petitioner George Varriale ("Petitioner" or "Varriale") voluntarily consented to a search of his person, in the form of buccal and penile swabs, for the purpose of furnishing a DNA sample to the Anne Arundel County Police Department during the latter's investigation of a rape allegation. Although the DNA profile created from the extraction of Varriale's DNA supported the conclusion that he did not commit the alleged rape, it subsequently connected him to an earlier, unrelated burglary when Varriale's DNA profile was uploaded to the local DNA database and an automatic search revealed a match to a DNA profile created from the burglary crime scene evidence collected in 2008. Following his indictment on the burglary and related charges, Varriale sought to suppress the DNA evidence as an unlawful search under the Fourth Amendment to the United States Constitution. After the suppression hearing judge denied the motion, Varriale entered into a conditional guilty plea to second degree burglary. He noted a timely appeal of his conviction for burglary. In this case, we shall hold that, where Varriale's consent to search

---

[1] This Court explained recently that a "DNA profile" is defined as "[t]he genetic constitution of an individual at defined locations (also known as loci) in the DNA . . . [and] [o]nce a DNA profile is prepared, it can be compared with profiles produced by other samples, a process we have previously referred to as 'DNA profiling.'" *Allen & Diggs v. State*, 440 Md. 643, 660, 103 A.3d 700, 710 (2014) (citing *Young v. State*, 388 Md. 99, 110, 879 A.2d 44, 50 (2005)).

was not expressly limited by him, by the State, or by law, the Fourth Amendment does not preclude the State from storing and using his voluntarily provided DNA sample and resultant DNA profile for additional, unrelated criminal investigations.[2]

## FACTUAL AND PROCEDURAL HISTORY

On the morning of July 10, 2012, Detective David Wood of the Anne Arundel County Police Department responded to a call about an alleged rape in the wooded area behind a liquor store in Glen Burnie, Maryland. Upon his arrival at the scene, he was informed that the patrol officers who originally responded to the call had located a possible suspect named

---

[2] The dissenting opinion assails the analysis and conclusions of the majority opinion on several fronts. In doing so, the dissenting opinion refuses to accept three basic propositions of law: (1) that Varriale's consent to the search of his body and the analysis of his DNA stems from his voluntary consent, which provided the same authority to law enforcement as if his DNA had been collected pursuant to a search warrant; (2) that by consenting to a search of his person and DNA, as he did, Varriale waived any reasonable expectation of privacy in his DNA for future comparison in other cases; and (3) that only one search occurred in this case, a conclusion which is based squarely within the law as explained recently by both this Court and the United States Supreme Court. As we explain in this opinion, the United States Supreme Court explained the law concerning DNA identification in *Maryland v. King*, __ U.S. __, __, 133 S. Ct. 1958, 1972, 186 L. Ed. 2d 1, __ (2013) (noting that "the use of DNA for identification is no different than matching an arrestee's face to a warrant poster of a previously unidentified suspect; . . . or matching the arrestee's fingerprints to those recovered from a crime scene"), and this Court subsequently interpreted that law in *Raynor v. State*, 440 Md. 71, 82, 99 A.3d 753, 759 (2014), *cert. denied*, 135 S. Ct. 1509, 191 L. Ed. 2d 433 (2015) (holding that the DNA testing of the defendant's genetic material collected from the armrest of a chair at a police station and comparison of the 13 identifying loci in order to determine a match with DNA the police collected from the scene of the rape was not a "search" for Fourth Amendment purposes). Applying the principles announced in those cases, we conclude here that Varriale's consent opened the door to all that took place, and we do not subscribe to the dissenting opinion's view that there should exist a separate set of rules governing the use of DNA in "cold cases."

"George," a homeless man living in a tent in the wooded area behind the liquor store.

Detective Wood approached "George," who then identified himself as George Varriale.

Detective Wood identified himself, explained that he was conducting an investigation, and

asked Varriale if he would consent to a search of his person. Detective Wood read the Anne

Arundel County Police Department's standard Consent to Search Person Form ("consent

form") to Varriale and placed a completed consent form in front of him for his signature.

Varriale agreed to submit to a search of his person in the form of saliva and penile swabs and

signed the form. The consent form stated:

Case #: 12-725920
Date:　　7-10-12

> I, George Varriale, do hereby consent to a search of my person for the purpose
> of furnishing evidence relating to one or more of the following:
>
> *Hair　Blood　　　Saliva　　　Fibers　　　Penile Swabs*
> *Pubic Hair Combings　Marks or Injuries　Fingerprints　Photographs*
>
> I know that I do not have to consent to a search of my person.
>
> I realize that if I do consent to a body search, that any evidence found to be
> involved in this investigation, being conducted by the Anne Arundel County
> Police Department can be used in any future criminal prosecution.
>
> This written consent to search my body is being given by me, George Varriale,
> to Det. Wood # 1371 and any member of the Anne Arundel County Police
> Dept. and/or medical personnel, voluntarily, without threat or promise of any
> kind. I am not under the influence of any intoxicating beverage or drug, which
> would affect my judgment in consenting.

The words "saliva" and "penile swabs" were circled to denote the areas to be searched for

3

the collection of evidence.[3]  Shortly thereafter, an evidence technician collected a sample of Varriale's saliva and a swab of his penis for DNA testing.  Detective Wood did not arrest Varriale, question him further, or contact him again after July 10, 2012.

Detective Wood submitted the swabs collected from Varriale as well as evidence samples obtained from the female complainant to the County crime laboratory for serological and DNA analysis.  The crime laboratory issued a report dated December 12, 2012, stating that a partial DNA profile was obtained from fingernail swabs collected from the alleged victim and that Varriale was excluded as a source of that DNA.

Following the analysis and comparison of the known DNA samples, Varriale's DNA profile was uploaded into the suspect index of the County and State DNA databanks.  An automatic search of the County databank compared the DNA profiles of known persons, such as Varriale, to unidentified DNA profiles developed from crime scene evidence.  On December 14, 2012, the crime laboratory issued a report to Detective Wood stating that the automatic search resulted in a match between Varriale's DNA profile and a DNA profile associated with an unsolved commercial burglary that occurred in 2008.

Based on that DNA evidence, on March 29, 2013, Varriale was charged in the Circuit Court for Anne Arundel County with two counts of second degree burglary, theft over $1,000, and malicious destruction of property.  Varriale filed a motion to suppress the State's

---

[3] It is undisputed that Varriale consented to a search of his person for the purpose of obtaining DNA samples.

DNA match evidence, on the grounds that the subsequent use of his DNA to conduct a comparison search of the DNA databank exceeded the scope of his consent and, therefore, constituted an unreasonable search in violation of his Fourth Amendment rights. The Circuit Court held a hearing on Varriale's motion on August 2, 2013.

At the hearing, Ashley Hayes, a forensic DNA analyst and CODIS Administrator at the County crime laboratory, described the operation of the DNA database system and her analysis of Varriale's DNA sample. She explained that the County crime laboratory participates in CODIS, the FBI's Combined DNA Index System, which consists of three tiers: the National DNA Index System (NDIS), the State DNA Index System (SDIS), and the Local DNA Index System (LDIS).[4] Each tier represents a separate database within the combined system, CODIS.[5] Ms. Hayes testified that the Anne Arundel County crime

---

[4] Pursuant to the Maryland DNA Collection Act, Md. Code (2003, 2011 Repl. Vol., 2014 Supp.), § 2-501 *et seq*. of the Public Safety Article ("PS"), Maryland cooperates with the FBI's CODIS program. "CODIS" is defined by PS § 2-501(c) as "the Federal Bureau of Investigation's 'Combined DNA Index System' that allows the storage and exchange of DNA records submitted by federal, state, and local forensic DNA laboratories[,]" and "includes the national DNA index administered and operated by the Federal Bureau of Investigation." *See also* Federal Bureau of Investigation, *Frequently Asked Questions (FAQs) on the CODIS Program and the National DNA Index System*, http://www.fbi.gov/about-us/lab/biometric-analysis/codis/codis-and-ndis-fact-sheet (last visited July 30, 2015) ("CODIS . . . is the generic term used to describe the FBI's program of support for criminal justice DNA databases as well as the software used to run these databases. The National DNA Index System or NDIS is considered one part of CODIS, the national level, containing the DNA profiles contributed by federal, state, and local participating forensic laboratories.").

[5] In *Maryland v. King*, the United States Supreme Court described the nature and function of CODIS:

(continued...)

laboratory maintains a local DNA database, or LDIS, containing DNA samples from cases within the County, over which the County maintains ownership, to include any forensic case work samples and any suspect known samples tested within the County laboratory. She further explained that a "forensic sample" is a DNA sample associated with a crime scene, and a "suspect sample" is a DNA sample taken directly from a known individual who is a suspect in the case. Once samples are uploaded, Ms. Hayes explained, the database program automatically runs a weekly search and generates a report for any matches found within the LDIS, which the laboratory will review prior to determining eligibility for and uploading any DNA profiles to the SDIS or NDIS. Although the NDIS created a "suspect index," Ms.

---

(...continued)

> Authorized by Congress and supervised by the Federal Bureau of Investigation, the Combined DNA Index System (CODIS) connects DNA laboratories at the local, state, and national level. Since its authorization in 1994, the CODIS system has grown to include all 50 States and a number of federal agencies. CODIS collects DNA profiles provided by local laboratories taken from arrestees, convicted offenders, and forensic evidence found at crime scenes. To participate in CODIS, a local laboratory must sign a memorandum of understanding agreeing to adhere to quality standards and submit to audits to evaluate compliance with the federal standards for scientifically rigorous DNA testing. . . . In short, CODIS sets uniform national standards for DNA matching and then facilitates connections between local law enforcement agencies who can share more specific information about matched . . . profiles.

__ U.S. __, 133 S. Ct. 1958, 1968, 186 L. Ed. 2d 1, 18-19 (2013) (citations omitted). Federal and Maryland state law, respectively, specify and limit what types of DNA evidence can be uploaded to the NDIS and SDIS. *See* 42 U.S.C. § 14132 (governing entry of DNA evidence into the national databank, or NDIS); PS §§ 2-504 and 2-506 (governing collection and maintenance of DNA samples in the Maryland State databank, or SDIS). These statutes, however, do not encompass or regulate local databases, or LDIS.

6

Hayes testified that the County lab does not upload suspect samples, such as Varriale's sample, to either the SDIS or NDIS.

Next, Ms. Hayes testified regarding the analysis and treatment of Varriale's DNA sample. She explained that Varriale's DNA samples were analyzed to develop a DNA profile and then compared to the DNA profile developed from DNA evidence taken from the alleged rape victim. Ms. Hayes testified, and the lab report states, that there was no match between Varriale's DNA profile and the DNA profile obtained from the sexual assault evidence kit. Following the direct comparison analysis, and without informing Detective Wood or giving notice to Varriale, Ms. Hayes designated Varriale's DNA profile as a suspect sample and uploaded it to the LDIS and SDIS.

Following the suppression hearing, the Circuit Court for Anne Arundel County denied Varriale's motion to suppress the DNA evidence. Thereafter, on August 13, 2013, Varriale entered a conditional guilty plea to the second degree burglary charge, reserving his right to appeal the hearing judge's ruling on his motion to suppress. The State entered a *nolle prosequi* of the remaining charges. The Circuit Court sentenced Varriale to four years, suspending all but time served, and placed him on two years' probation. The same day, Varriale filed an appeal to the Court of Special Appeals.

In a reported opinion, the Court of Special Appeals affirmed, holding that the subsequent examination and use of Varriale's DNA in an unrelated investigation was not a search for the purposes of the Fourth Amendment. *Varriale v. State*, 218 Md. App. 47, 54,

7

96 A.3d 793, 797 (2014). Looking to Varriale's consent form to determine the scope of his

consent, the intermediate appellate court noted that the form was "not a model of clarity" but

in "constru[ing] this ambiguity against the State[,] . . . the consent form does not contain

Varriale's consent to the use of his DNA in criminal prosecutions that are unrelated to the

alleged rape." *Id.* Nevertheless, because the subsequent retention and examination of the

evidence was not a Fourth Amendment search, the Court of Special Appeals concluded:

> Even if Varriale did not unambiguously consent to the use of his DNA in
> criminal prosecutions that are unrelated to the alleged rape, he unquestionably
> consented to the taking of a DNA sample . . . . [and] once the State had validly
> obtained the sample, . . . it had no obligation to obtain a warrant before using
> the sample in a subsequent investigation.

218 Md. App. at 55, 96 A.3d at 797-98.[6]

We granted both Varriale's petition for certiorari and the State's cross-petition,

*Varriale v. State*, 441 Md. 61, 105 A.3d 489 (2014), to answer the following questions:

> 1. Whether the Fourth Amendment applies to law enforcement's retention and
> use, for general investigatory purposes, of Petitioner's DNA profile collected
> for a limited purpose?
>
> 2. If applicable, whether the Fourth Amendment permits the police to use
> Petitioner's DNA profile for a purpose that exceeded the limited terms of
> consent police relied on to collect Petitioner's DNA samples?
>
> 3. Did Petitioner consent to the collection and subsequent use of his DNA
> profile?

---

[6] The Court of Special Appeals also addressed the applicability of the Maryland DNA
Collection Act under these circumstances, and held that the Act's "statutory protections do
not extend to persons in Varriale's position." *Varriale*, 218 Md. App. at 59, 96 A.3d at 800.
This issue has not been challenged before this Court and therefore we do not address it.

For the reasons explained below, we hold that the Fourth Amendment did not prohibit the police from using Varriale's lawfully obtained DNA sample, where he consented to the search without placing an express limitation on his consent, for comparison to other DNA profiles that were unrelated to the rape investigation. Accordingly, we shall affirm the judgment of the Court of Special Appeals.

## DISCUSSION

Our standard of review of a trial court's ruling on a motion to suppress is well established. As we recently explained:

> In reviewing a trial court's ruling on a motion to suppress, an appellate court reviews for clear error the trial court's findings of fact, and reviews without deference the trial court's application of the law to its findings of fact. The appellate court views the trial court's findings of fact, the evidence, and the inferences that may be drawn therefrom in the light most favorable to the party who prevails on the issue that the defendant raises in the motion to suppress.

*Hailes v. State*, 442 Md. 488, 499, 113 A.3d 608, 614 (2015) (citations and quotations omitted). The suppression motion in this case addressed the scope of Varriale's consent to a search of his person for DNA. It is undisputed that Varriale voluntarily consented to the collection of buccal and penile swabs from his body. At issue is to what extent Varriale's DNA profile, created from analysis of the swabs, may be compared subsequently to other DNA profiles for criminal investigative purposes. In other words, what is disputed is whether the scope of Varriale's consent was limited to the investigation of one specific incident.

9

Varriale contends that his consent was limited to the collection and use of his DNA for purposes of the rape investigation alone and that the consent form objectively limits the purpose of the search to the rape investigation. He argues that any use of his DNA for purposes other than the rape investigation would exceed the scope of his consent and constitute a warrantless search in violation of the Fourth Amendment. Thus, in Varriale's view, the State exceeded the scope of his consent and violated his Fourth Amendment rights when the crime lab entered his DNA profile into the LDIS and compared it to DNA profiles for general criminal investigatory purposes after he had been eliminated as a suspect in the rape investigation.

The State counters that Varriale did not expressly limit his consent, that the consent form indicates that his DNA could be used in "any future prosecution," to include the burglary prosecution. In addition, the State contests Varriale's characterization of the crime laboratory's DNA comparison analysis as a "search" for purposes of the Fourth Amendment. Rather, the State maintains that the subsequent DNA comparison by automatic search was a "future use" of evidence that the police had lawfully obtained by consent, and that "use" does not implicate the Fourth Amendment.

### Scope of Consent to Search

The Fourth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, provides, in pertinent part, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable

10

searches and seizures, shall not be violated . . . ." U.S. Const. amend. IV. With regard to a search of a person, the United States Supreme Court has explained that "[v]irtually any intrusion into the human body will work an invasion of cherished personal security that is subject to constitutional scrutiny." *Maryland v. King*, __ U.S. __, __, 133 S. Ct. 1958, 1969, 186 L. Ed. 2d 1, 19 (2013) (citations and quotations omitted). It is undisputed that the State engaged in a "search" when the County evidence technician took buccal and penile swabs to obtain Varriale's DNA. *See King*, __ U.S. at __, 133 S. Ct. at 1968-69, 186 L. Ed. 2d at 19 ("It can be agreed that using a buccal swab on the inner tissues of a person's cheek in order to obtain DNA samples is a search."); *Raynor v. State*, 440 Md. 71, 82, 99 A.3d 753, 759 (2014), *cert. denied*, 135 S. Ct. 1509, 191 L. Ed. 2d 433 (2015) (same).

Ordinarily, a search of a person conducted without a warrant, such as here, is presumptively unreasonable, unless one of the recognized exceptions to the warrant requirement applies. Relevant to this case is the consent exception. For a consensual search to satisfy the Fourth Amendment, the consent must be voluntary, *i.e.*, free from coercion. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973) (explaining that to be valid, consent to search must be voluntary, and a reviewing court's evaluation of "voluntariness" is based on the totality of the circumstances); *Jones v. State*, 407 Md. 33, 51, 962 A.2d 393, 403 (2008) ("A search conducted pursuant to valid consent, *i.e.*, voluntary and with actual or apparent authority to do so, is a recognized exception to the warrant requirement."). In addition, "'[a] consensual search may go no further than the

11

limits' defined by the consent." *Gamble v. State*, 318 Md. 120, 129, 567 A.2d 95, 100 (1989) (quoting *State v. Jensen*, 723 P.2d 443, 446 (Wash. App. 1986)). *See also* 4 LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 8.1(c) (5th ed. 2012) ("When the police are relying upon consent as the basis for their warrantless search, they have no more authority than they have apparently been given by the consent."). In other words, a consensual search may be limited in scope. *See Florida v. Jimeno*, 500 U.S. 248, 252, 111 S. Ct. 1801, 1804, 114 L. Ed. 2d 297, 303 (1991) ("A suspect may of course delimit as he chooses the scope of the search to which he consents."). In this case, Varriale does not dispute that his consent was voluntary. Thus, we shall confine our discussion to the disputed scope of his consent.

In *Jimeno*,[7] the High Court explained that "[t]he scope of a search is generally defined

---

[7] *Florida v. Jimeno* is the seminal Supreme Court case governing scope of consent for a Fourth Amendment search. In that case, a law enforcement officer suspected Jimeno of illegal drug trafficking and followed Jimeno in his vehicle. *Jimeno*, 500 U.S. at 249, 111 S. Ct. at 1803, 114 L. Ed. 2d at 301. Upon witnessing Jimeno fail to stop before turning right at a red light, the officer pulled him over. *Id.* On the side of the road, the officer explained that he had reason to believe Jimeno was in possession of illegal narcotics and requested permission to search his vehicle, which Jimeno granted. *Jimeno*, 500 U.S. at 249-50, 111 S. Ct. at 1803, 114 L. Ed. 2d at 301-02. While conducting the search, the officer found and opened a brown paper bag, which contained a kilo of cocaine. *Jimeno*, 500 U.S. at 250, 111 S. Ct. at 1803, 114 L. Ed. 2d at 302. Thereafter, Jimeno was charged with possession with intent to distribute. *Id.* Before trial, Jimeno filed a motion "to suppress the cocaine found in the bag on the ground that [his] consent to search the car did not extend to the closed paper bag inside of the car." *Id.* The motion was granted, and the case made its way to the United States Supreme Court "to determine whether consent to search a vehicle may extend to closed containers found inside the vehicle." *Id.* Under the facts of that case, the Court concluded:

> [T]he terms of the search's authorization were simple. [Jimeno] granted
> Officer Trujillo permission to search his car, and did not place any explicit

(continued...)

12

by its expressed object." 500 U.S. at 251, 111 S. Ct. at 1804, 114 L. Ed. 2d at 303. In this case, the consent form clearly states that Varriale gave his "consent to a search of [his] person for the purpose of furnishing evidence relating to . . . saliva [and] penile swabs." Although the form does not specify precisely what the police would do with the swabs once the evidence was furnished, "[i]t is undisputed that law enforcement officers analyze DNA for the sole purpose of generating a unique identifying number against which future samples may be matched." *King*, __ U.S. at __, 133 S. Ct. at 1979, 186 L. Ed. 2d at 31.[8] Thus, the

_____

(...continued)

> limitation on the scope of the search. Trujillo had informed Jimeno that he believed Jimeno was carrying narcotics, and that he would be looking for narcotics in the car. We think that it was objectively reasonable for the police to conclude that the general consent to search respondent's car included consent to search containers within that car which might bear drugs. A reasonable person may be expected to know that narcotics are generally carried in some form of a container. Contraband goods rarely are strewn across the trunk or floor of a car. The authorization to search in this case, therefore, extended beyond the surfaces of the car's interior to the paper bag lying on the car's floor.

500 U.S. at 251, 111 S. Ct. at 1804, 114 L. Ed. 2d at 303(citation omitted).

[8] We note briefly that identification is a key component to our analysis of DNA cases. As noted by the State in its brief, the State analyzes DNA evidence to obtain DNA profiles derived from the non-coding regions of DNA, commonly referred to as "junk DNA." "Although highly useful for identification purposes, junk DNA 'does not show more far-reaching and complex characteristics like genetic traits.'" *Raynor*, 440 Md. at 86, 99 A.3d at 761 (quoting *King*, __ U.S. at __, 133 S. Ct. at 1967, 186 L. Ed. 2d at 17). For that reason, discussed further *infra*, this Court held in *Raynor* that an individual does not retain a privacy interest in his DNA profile, once it is lawfully possessed by the State, which would entitle him or her to the protections of the Fourth Amendment. *Raynor*, 440 Md. at 96, 99 A.3d at 767 ("In the end, we hold that DNA testing of the 13 identifying junk loci within genetic material, not obtained by means of a physical intrusion into the person's body, is no more a

(continued...)

13

"object" of the search was the collection of the DNA swabs for the purpose of identification. *See Commonwealth v. Gaynor*, 820 N.E.2d 233, 244 (Mass. 2005) ("The object of the intended search was a sample of the defendant's blood and the identifying information that could be obtained by DNA testing of the sample.").

The consent form further provides that Varriale understood "that any evidence found to be involved in this investigation, being conducted by the Anne Arundel County Police Department can be used in any future criminal prosecution." Varriale asserts that this form limits the scope of the search to use only in the rape investigation and any potential criminal prosecution related to that specific investigation. More specifically, he asserts that by signing the form, he conditioned his consent on the restrictions contained therein; in his view, "evidence found in *this* investigation" meant the investigation of the rape. (Emphasis added.) Varriale contends that the form does not purport to provide general consent, which would impose no restriction on the future use of the DNA evidence.

The State counters that the consent form is not so limiting, and, in fact, the use of the phrase "can be used for any future criminal prosecution" demonstrates consent to any and all subsequent uses of the DNA evidence garnished from the search. In its opinion in this case,

--------------------------------------------------------------------------------

(...continued)
search for purposes of the Fourth Amendment, than is the testing of fingerprints, or the observation of any other identifying feature revealed to the public—visage, apparent age, body type, skin color."). It is noteworthy, however, that the Supreme Court has cautioned that "[i]f in the future police analyze samples to determine, for instance, an arrestee's predisposition for a particular disease or other hereditary factors not relevant to identity, that case would present additional privacy concerns not present here." *King*, __ U.S. at __, 133 S. Ct. at 1979, 186 L. Ed. 2d at 31.

14

the Court of Special Appeals aptly pointed out that the consent form "is not a model of clarity." 218 Md. App. at 54, 96 A.3d at 797. The consent form demonstrates neither an express limitation on the permitted use of the DNA evidence nor an express consent to any future use. Indeed, the form does not specify what the State would do with the DNA evidence once it was collected (namely, that it would retain the DNA profile and upload it to the LDIS). Unlike the Court of Special Appeals, however, we do not conclude that the form should be construed against the State to mean that there was no consent to the subsequent use and analysis of Varriale's DNA.

As instructed by the Supreme Court in *Jimeno*, we apply an objective reasonableness test. *See Jimeno*, 500 U.S. at 251, 111 S. Ct. at 1803-04, 114 L. Ed. 2d at 302 ("The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness-what would the typical reasonable person have understood by the exchange between the officer and the suspect?"). "[D]etermining what is reasonable requires a factual analysis, 'examining the totality of the circumstances.'" *State v. Green*, 375 Md. 595, 621, 826 A.2d 486, 501 (2003) (quoting *Ohio v. Robinette,* 519 U.S. 33, 39, 117 S. Ct. 417, 421, 136 L. Ed. 2d 347, 354 (1996)).

Varriale argues that no reasonable person would understand that his DNA evidence and/or DNA profile would be indefinitely retained by the State and used in subsequent criminal investigations. We disagree. Both this Court and the United States Supreme Court have explained that DNA profiles are like fingerprints, which police routinely catalog and

15

compare in the course of criminal investigations. *See King*, __ U.S. at __, 133 S. Ct. at 1972, 186 L. Ed. 2d at 23; *Raynor*, 440 Md. at 88, 99 A.2d at 762. In that regard, the Court of Special Appeals has explained:

> Once the police are in reasonable possession of the fingerprints, however, those fingerprints are kept on file, . . . so that they are available for future criminal investigations. No further Fourth Amendment authorization is required for the police freely to comb such fingerprint banks to seek out and to identify criminals. Indeed, it is difficult to conceive of a modern law enforcement system without such fingerprint banks.

*Wilson v. State*, 132 Md. App. 510, 549, 752 A.2d 1250, 1271 (2000). The same rationale holds true for the collection and use of DNA. As explained by the Georgia Supreme Court, "like a fingerprint, DNA remains the same no matter how many times blood is drawn and tested and a DNA profile can be used to inculpate or exculpate suspects in other investigations without additional invasive procedures. It would not be reasonable to require law enforcement personnel to obtain additional consent or another search warrant every time a validly-obtained DNA profile is used for comparison in another investigation." *Pace v. State*, 524 S.E.2d 490, 498 (Ga. 1999).

Our conclusion is consistent with our analysis, *supra*, regarding what we have defined to be the "object" of the *search*–namely, the collection of the DNA swabs for the purpose of identification. The rationale of the Supreme Judicial Court of Massachusetts examining this topic is instructive. In *Commonwealth v. Gaynor*, 820 N.E.2d 233 (Mass. 2005), the defendant consented to provide palmprints, fingerprints, and a blood sample while speaking voluntarily with officers at the police station. At the time the defendant came to the station,

16

the police officers were in possession of, and the defendant viewed, a car belonging to a murder victim that had a blood stain on the front passenger seat. *Id.* at 241. The police submitted the defendant's blood sample for DNA testing, which revealed his involvement in a total of four rape and murder incidents, including the one victim whose car the defendant viewed at the police station, who turned out to be the fourth victim in the string of incidents. *Id.* at 239-42. The defendant argued that his consent "was limited by what police told him, namely, that they wanted to test his blood and compare the results with testing done on blood found in the fourth victim's car." *Id.* at 244. Citing *Jimeno*, the Massachussets court explained:

> Here, a reasonable person likely would have concluded that police were seeking the defendant's blood tests results, including his DNA profile. The object of the intended search was a sample of the defendant's blood and the identifying information that could be obtained by DNA testing of the sample. The testing actually done on the defendant's blood sample was no more intense or intrusive of his privacy interests than what was expressly sought. The scope of the search, blood tests, was confined to what a reasonable person would have understood from the request by police.

*Id.* Finally, the *Gaynor* court noted that, "[a]lthough it is a suspect's right to limit the scope of a search to which he consents, [Gaynor] did not avail himself of that right." 820 N.E.2d at 244 (citation omitted). Therefore, the court held that the scope of the search was not limited to one particular investigation. *Id. See also People v. Collins*, 250 P.3d 668, 676 (Colo. App. 2010) (comparing that case to *Gaynor* and concluding that where a suspect orally consented to provide police with a DNA sample during an ongoing robbery investigation in Missouri without "limit[ing] the scope of his consent in any way," "the scope of the actual

17

search . . . was limited to its intended object, namely, a sample of defendant's saliva for DNA testing[,] . . . the typical reasonable person in defendant's place would have understood that the DNA sample taken from him and the data obtained from analysis of the sample would remain in possession of law enforcement and be available for future law enforcement uses" and therefore the police did not violate the suspect's rights by subsequently sharing the voluntarily proffered DNA sample with police in Colorado, who thereafter connected the suspect to a "cold" rape case in Colorado).

Looking at the totality of the circumstances of this case, we cannot conclude that the lawful use of Varriale's DNA was limited only to the rape investigation. It is undisputed that Varriale made no express limitation indicating that his consent was limited to or conditioned upon the DNA evidence being used exclusively in the rape investigation.[9] In addition, nothing in the record indicates that Detective Wood gave any representation whatsoever to Varriale regarding what would happen to his DNA following the analysis required for the

---

[9] Varriale urges us to rely on *State v. Binner*, 886 P.2d 1056 (Or. Ct. App. 1994), an Oregon intermediate appellate court case, for the proposition that a DNA sample taken for one purpose cannot be used subsequently for a different purpose without offending the Fourth Amendment. In *Binner*, police suspected the defendant to be intoxicated after he was involved in a fatal car accident. *Id.* at 1057. Upon request by the police, the defendant consented to provide a blood sample for alcohol testing but specifically refused to provide a urine sample for drug testing. *Id.* The Oregon court held that the police violated the defendant's Fourth Amendment rights when the blood sample was subsequently submitted to a drug test. *Id.* at 1059. That holding, however, was based on the defendant's express refusal to submit to drug testing. *Id.* Thus, *Binner* is inapposite to this case, because Varriale placed no express limitation on his consent to the search.

rape investigation.[10] Therefore, absent an express limitation placed on the use or storage of the DNA evidence by Varriale, the State, or by law, we cannot conclude that it was unreasonable for the State to maintain and utilize Varriale's DNA for subsequent unrelated investigations.

Although we could end our analysis here, we shall discuss Varriale's questions concerning the applicability of the Fourth Amendment to the subsequent use of his evidence. As we shall explain, Varriale's failure to place an express limitation on the use or storage of his DNA sample at the time he provided consent constituted a waiver of any privacy interest in that DNA sample and the State was not prohibited from utilizing his DNA profile in subsequent criminal investigations.

### Subsequent Use of Varriale's DNA

We begin with the proposition that, for the reasons explained above, the DNA evidence was lawfully within the State's possession after the samples were collected from

---

[10] If, as a basis to obtain Varriale's consent to search, Detective Wood had made any statements or promises to Varriale regarding the retention or use of his DNA, our analysis might be different. For example, deceit or misrepresentation by a police officer to obtain consent to search may negate the voluntariness of the consent. *See Redmond v. State*, 213 Md. App. 163, 186, 73 A.3d 385, 399 (2013) (holding that, where police intentionally misrepresented their purpose to gain entry to a house by consent, the search was invalid for two reasons: (1) the consent was involuntary; and (2) the scope of consent was limited by the officers' misrepresented purpose to gain entry). In addition, at least one court has held that a police officer is not required to inform or explain to a suspect that his DNA evidence may be retained indefinitely by police. *See Pace v. State*, 524 S.E.2d 490, 498 (Ga. 1999) ("The police were not required to explain to Pace that his blood or hair could be used in prosecutions involving other victims, or that he had a right to refuse consent."). We agree that under the circumstances, no such explanation was necessary.

19

Varriale's person. In *Raynor v. State*, *supra*, this Court held recently that once the State lawfully possessed a suspect's DNA, subsequent testing of that DNA does not amount to a Fourth Amendment search. 440 Md. at 96, 99 A.3d at 767. In that case, police suspected Raynor in connection with a rape investigation and invited him to the police station for questioning, which Raynor did of his own volition. *Raynor*, 440 Md. at 76, 99 A.3d at 755. During questioning, a detective requested that Raynor submit to DNA testing. *Id.* Raynor refused to consent unless the police agreed to destroy his DNA sample upon completion of the rape investigation, which the police declined to do. *Raynor*, 440 Md. at 76, 99 A.3d at 756. After Raynor left the station, the officers present observed sweat on the chair in which Raynor had been seated, from which they were able to successfully collect a sample of Raynor's DNA. *Raynor*, 440 Md. at 77, 99 A.3d at 756. Forensic DNA analysis confirmed Raynor's involvement in the rape, for which he was subsequently tried and convicted. *Id.*

Noting that the petitioner had conceded that the State's collection of the DNA was lawful, the Court addressed only whether, once the DNA had been lawfully obtained, subsequent police "testing of the identifying loci within that DNA material for the purpose of determining whether those loci match that of DNA left at a crime scene constitute[d] a search under the Fourth Amendment." *Raynor*, 440 Md. at 82, 99 A.3d at 759. Relying on the Supreme Court's explanation in *King* that the "junk" DNA used in this type of DNA analysis is used only for identification purposes, much like fingerprints, the Majority determined that Raynor "[did] not possess a reasonable expectation of privacy in the

20

identifying characteristics of his DNA." 440 Md. at 86-88, 92, 99 A.3d at 761-62, 765 (citing *King*, __ U.S. at __, 133 S. Ct. at 1967, 186 L. Ed. 2d at 17).

In making this conclusion, the Court in *Raynor* specifically distinguished *United States v. Davis*, 690 F.3d 226 (4th Cir. 2012), a federal case on which Varriale relies for the proposition that the retention and inclusion of his DNA in the LDIS violated his constitutional rights. In that case, police collected bloody pieces of clothing from Davis when he was in the hospital being treated for a gunshot wound. *Davis*, 690 F.3d at 230. Four years later, when the police suspected Davis in relation to a murder investigation, police used the bloodstained clothing, still in their possession, to create a DNA profile which was uploaded to the department's local DNA database. *Id.* Thereafter, a piece of DNA evidence from another, unrelated murder investigation resulted in a "cold hit" with regard to Davis's DNA, which was used to prosecute him for the murder. *Id.* at 232. At trial, Davis moved to suppress the DNA evidence on Fourth Amendment grounds. *Id.* On appeal of his conviction, the United States Court of Appeals for the Fourth Circuit concluded that Davis retained a privacy interest in his genetic material even though the genetic material was on an item of clothing that was in the possession of and had previously been lawfully obtained by law enforcement. *Id.* at 246. Therefore, the Fourth Circuit held that the subsequent testing of that DNA was a search for the purposes of the Fourth Amendment. *Id.* This Court in *Raynor* explained that "[t]he *Davis* Court's conclusion that the DNA testing at issue in that case constituted a Fourth Amendment search rested on what may now be a faulty premise,

21

given the discussion in *King* that DNA analysis limited to the 13 junk loci within a person's

DNA discloses only such information as identifies with near certainty that person as unique."

*Raynor*, 440 Md. at 90, 99 A.3d at 764. *See also Commonwealth v. Arzola*, 26 N.E.3d 185,

194 (Mass. 2015) (distinguishing *Davis* and noting that "[t]he *Davis* court never fully

addressed the limited scope of the DNA analysis: to develop a DNA profile that would serve

as a genetic fingerprint to be compared with unknown DNA profiles"). Further, we noted

that, "because no individual has a reasonable expectation of privacy in his or her identifying

physical characteristics[,] [i]t therefore matters not that, at the time of the analysis, [Raynor]

was, in the words of *Davis*, a 'free person.'" *Raynor*, 440 Md. at 90 n.9, 99 A.3d at 764 n.9.[11]

In addition, the Court explained, "[Raynor] was not subjected to the forcible collection of

his genetic material, or any other bodily intrusion." 440 Md. at 94, 99 A.3d at 766.

Therefore, we held that "law enforcement's analysis of the 13 identifying loci within

Petitioner's DNA left behind on the chair at the police station, in order to determine a match

with the DNA the police collected from the scene of the rape, was not a search, as that term

is employed in Fourth Amendment parlance." 440 Md. at 82, 99 A.3d at 759.

Varriale would distinguish *Raynor* from this case based on the "degree and scope of

intrusion" at issue here, and liken the instant case to the Supreme Court's decision in

*Ferguson v. City of Charleston*, 532 U.S. 67, 121 S. Ct. 1281, 149 L. Ed. 2d 205 (2001). In

---

[11] Similarly, Varriale's reliance on the fact that he is not an individual with "diminished rights," such as an arrestee or convicted person, to support his argument that the State violated his Fourth Amendment rights is not relevant to our analysis.

that case, the Supreme Court noted the difference between collecting urine samples for medical purposes as compared to law enforcement purposes, and held that a state hospital's practice of collecting urine samples for drug testing and reporting positive test results to law enforcement constituted an unreasonable search. *Ferguson*, 532 U.S. at 83-84, 121 S. Ct. at 1291-92, 149 L. Ed. at 219-20. We disagree with Varriale that the analysis in *Ferguson* controls here, because Varriale indisputably consented to provide his DNA to law enforcement for criminal investigative purposes. *See Pharr v. Commonwealth*, 646 S.E.2d 453, 458 (Va. App. 2007) (concluding that where the suspect "specifically consented to having his DNA taken, tested, and identified for purposes of criminal investigation, . . . the principles enunciated in *Ferguson* are inapposite").

In addition, as noted in its opinion in this case, the Court of Special Appeals previously discussed the re-examination of DNA evidence in *Wilson v. State*, 132 Md. App. 510, 752 A.2d 1250 (2000). In that case, law enforcement had lawfully obtained the appellant's blood sample pursuant to a valid warrant in 1991. *Wilson*, 132 Md. App. at 531, 752 A.2d at 1262. In 1997, Wilson was a suspect in a rape and abduction investigation. 132 Md. App. at 516-17, 752 A.2d at 1254. In conducting their investigation, law enforcement learned that Wilson's 1991 blood sample was within their possession and available for re-testing, such that no new or additional blood sample would be necessary. 132 Md. App. at 531, 752 A.2d at 1262. Using the 1991 sample, DNA analysis confirmed Wilson's involvement in the rape, and he was subsequently convicted.

Before the Court of Special Appeals, Wilson argued that his Fourth Amendment rights were violated when the police tested his 1991 blood sample in 1997 without obtaining a second warrant. *Wilson*, 132 Md. App. at 543, 752 A.2d at 1268. The court disagreed, stating that "no such fresh authorization is required." *Wilson*, 132 Md. App. at 544, 752 A.2d at 1269. Using the DNA/fingerprint analogy (later adopted by the Supreme Court in *King*, *supra*), Judge Moylan, writing for the court, explained:

> Once an individual's fingerprints and/or his blood sample for DNA testing are in lawful police possession, that individual is no more immune from being caught by the DNA sample he leaves on the body of his rape victim than he is from being caught by the fingerprint he leaves on the window of the burglarized house or the steering wheel of the stolen car. . . . By the same token, photographs, handwriting exemplars, ballistics tests, etc., lawfully obtained in the course of an earlier investigation are freely available to the police in the course of a new and unrelated investigation. No new Fourth Amendment intrusion is involved.

132 Md. App. at 550, 752 A.2d at 1272. Moreover, the court held, once the State had lawfully obtained Wilson's blood sample pursuant to the 1991 warrant, "[a]ny legitimate expectation of privacy that the appellant had in his blood disappeared." *Id.*

Although *Wilson* involved DNA obtained by a warrant rather than consent, we conclude that, absent an express limitation by the suspect, the same analysis applies to a consent search. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 243, 93 S. Ct. 2041, 2056, 36 L. Ed. 2d 854, 872 (1973) ("The actual conduct of the [consensual] search may be precisely the same as if the police had obtained a warrant."); *Gamble v. State*, 318 Md. 120, 129, 567 A.2d 95, 100 (1989) (explaining that the scope of a consent search is "just as broad" as a

24

warrantless search based on probable cause).  In its brief in this case, the State correctly

points out that, under these circumstances, "[t]he Fourth Amendment is concerned with the

way in which the State comes into possession of material, not with its subsequent use of it[.]"

Where the Fourth Amendment is not triggered, there is no need for the State to obtain a

warrant, nor must the State prove validity under one of the warrant exceptions.  *See Raynor*,

440 Md. at 82-83, 99 A.3d at 759 ("It is bedrock constitutional law that the rights accorded

by the Fourth Amendment are implicated only if the conduct of the government officials at

issue infringed an expectation of privacy that society is prepared to consider reasonable.")

(citations and quotations omitted).  Under the facts of this case, the State lawfully obtained

Varriale's DNA by consent.  In providing his consent, Varriale placed no express limitation

on the subsequent use or storage of his genetic material and, therefore, as explained above,

he waived any potential privacy interest he may have had in that genetic material.[12]

Moreover, as explained in *Raynor*, Varriale has no privacy interest in his identifying

information contained in the DNA profile created from lawfully obtained DNA samples

_____

[12] We make note of two other points.  First, the dissenting opinion's suggestion that Varriale's privacy rights were somehow restored to full vigor once the department's DNA analysis revealed that Varriale was excluded as a possible suspect in the rape investigation is pure fiction.  Once Varriale consented to the search in this case, any reasonable expectation of privacy in his identity essentially evaporated.  It did not reappear once he became a suspect in another crime.

Second, because our analysis rests on the conclusion that Varriale did not place any limitations on the use of his DNA, we need not decide what protections a suspect may have in a case involving a consensual search where the suspect does in fact place an express limitation on the use of DNA evidence and the State has conceivably exceeded the scope of consent given.  We leave that question for another day.

which would entitle him to the protections of the Fourth Amendment. Thus, in this case, after the initial search of Varriale's person to obtain the DNA swabs, the Fourth Amendment was not triggered. Therefore, the State did not need a warrant or Varriale's additional or express consent in order to conduct further testing of his DNA or upload it to the LDIS for comparison with other DNA profiles.[13]

Therefore, we reject Varriale's contention that his Fourth Amendment rights were violated when his DNA was uploaded to the LDIS and subsequently used in the burglary investigation and prosecution. We agree with the Court of Special Appeals in this case that "once the State had validly obtained the sample, . . . it had no obligation to obtain a warrant before using the sample in [another unrelated] investigation." *Varriale*, 218 Md. App. at 55,

---

[13] Other courts have reached the same conclusion. *See, e.g., Washington v. State*, 653 So.2d 362, 364 (Fla. 1994) (holding that, where defendant "freely and voluntarily provided [detectives] with hair and blood samples. . . . the samples were validly obtained, albeit in an unrelated case, [and] the police were not restrained from using the samples as evidence in the murder case"); *State v. Hauge*, 79 P.3d 131, 145 (Haw. 2003) ("[R]egardless of the number of times that the [police] tested Hauge's blood sample for its DNA, no violation of his constitutional right to privacy occurred because the analyses did not exceed the objective for which the original warrant was sought–DNA testing for the purpose of identification."); *Smith v. State*, 744 N.E.2d 437, 439 (Ind. 2001) ("[O]nce DNA is used to create a profile, the profile becomes the property of the Crime Lab[,] [t]hus, Smith had no possessory or ownership interest in it."); *State v. Bowman*, 337 S.W.3d 679, 685 (Mo. 2011) ("Fourth Amendment analysis focuses on the intrusiveness of the initial search, not on the subsequent use of information obtained from that search. . . . [T]he subsequent use of the DNA sample obtained from the valid [consensual] search and seizure does not constitute a Fourth Amendment violation."); *State v. Notti*, 71 P.3d 1233, 1238 (Mont. 2003) ("We conclude that Notti waived any reasonable expectation of privacy in the DNA profile created by the Crime Lab. After the initial withdrawal of blood, obtained pursuant to the initial sexual assault investigation, there was simply no subsequent search or seizure of Notti's person such that Notti could invoke a privacy interest or right.").

96 A.3d at 797-98.  Accordingly, we hold that, under these circumstances, the Fourth

Amendment does not preclude the police from retaining and using a suspect's DNA profile

created from a DNA sample lawfully obtained by consent.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. PETITIONER TO PAY THE COSTS.**

Circuit Court for Anne Arundel County
Case No. 02-K-13-000548
Argued: 7 May 2015

IN THE COURT OF APPEALS
OF MARYLAND

No. 85

SEPTEMBER TERM, 2014

GEORGE VARRIALE

v.

STATE OF MARYLAND

Barbera, C.J.,
*Harrell, J.
Battaglia,
Greene,
Adkins,
McDonald,
Watts,

JJ.

Dissenting Opinion by Harrell, J., which
Adkins, J. joins.

Filed: August 11, 2015

*Harrell, J., now retired, participated in the
hearing and conference of this case while an
active member of this Court; after being
recalled pursuant to the Constitution, Article IV,
Section 3A, he also participated in the decision
and        adoption        of        this        opinion.

This case illustrates a corollary of the aphorism that "no good deed goes unpunished," "be not so quick to volunteer." After the report of an alleged rape, George Varriale (at worst, a person of interest at the time) consented to a police request that he supply biological samples from his person in order for police to determine whether he could be inculpated or exculpated as a suspect in the rape through comparison of his DNA profile with that of DNA left behind under the fingernails of the alleged victim apparently by the alleged unknown rapist.[1] Based on the results of an Anne Arundel County crime laboratory comparison test performed on the samples provided by Varriale and those recovered from the alleged victim, Varriale was excluded quickly as a source of the DNA recovered from the victim. Despite this result, the Anne Arundel County Police Department Crime Laboratory forensic DNA analyst who performed the test uploaded (on her initiative) Varriale's profile into the general suspect index of the County DNA databank in a fishing expedition to see if Varriale's DNA profile matched any cold case DNA profile on record. That search yielded a match of Varriale's DNA to a DNA profile obtained from an unsolved commercial burglary scene. The burglary occurred four years earlier.

The Majority determines today, among other things, that Varriale is to be faulted for not placing any "express limitation(s)" on his consent when he acquiesced to the

_____

[1] The Forensic Biology Report from the Anne Arundel County Police Crime Laboratory indicated that no blood or semen was found on the person of the alleged victim. Furthermore, the partial DNA profile obtained from the alleged victim's fingernail swabs was consistent with her own DNA profile. The State's Attorney's Office declined charges in the case ultimately, and the case was closed "by exception," whatever that means.

collection of buccal and penile swabs from his body for use in the rape investigation. The Majority holds that, absent "an express limitation on his consent," "the Fourth Amendment did not prohibit the police from using Varriale's lawfully obtained DNA sample . . . for comparison to other DNA profiles that were unrelated to the rape investigation." Maj. Slip Op. at 9. The Majority's interpretation of Varriale's consent is incorrect as a matter of law. It follows that the Majority's Fourth Amendment analysis is flawed as well. Accordingly, I dissent.

## I. CONSENT, OR THE LACK THEREOF

As the Majority opinion sets out in full, George Varriale's consent to have biological samples taken from his person occurred during the late morning of 10 July 2012 in a wooded area in Glen Burnie, Maryland. Maj. Slip Op. at 2–4. Detective David Wood ("Detective Wood"), who was investigating a report of a rape occurring nearby, approached Varriale, a homeless person who was living in a makeshift campground in a wooded area near the scene of the alleged crime, and introduced himself. Detective Wood explained that "he was conducting an investigation,"[2] Maj. Slip Op. at 3, and asked

---

[2] The record is unclear regarding whether, before Varriale gave his biological samples, Detective Wood specified verbally that he was conducting an investigation *of a rape*.

    Detective Wood's Investigative Report, detailing his actions of 10 July 2012, was included in the materials provided to the Circuit Court of Anne Arundel County in advance of the Motion to Suppress hearing. In pertinent part, Detective Wood's Investigative Report states as follows:

> I met with Officer Pederson in the wooded area . . . .
> [The subject] identified himself as George Varriale. . . . I
> informed Mr. Varriale I was conducting an investigation and I
> wanted an opportunity to talk to him. I told him he was not

(Continued…)

2

under arrest and was not under any obligation to talk to me. He agreed to talk to me and he gave me consent to use a digital voice recorder for the interview. . . .

I advised Mr. Varriale we would like to collect saliva swabs and penile swabs from him. I placed a completed Consent to Search Person form in front of him and read the form to him. He agreed to give the Anne Arundel County Police Department consent to a search of his person for the purpose of furnishing evidence relating to saliva and penile swabs.

The Investigative Report then recounts in detail the conversation Detective Wood had with Varriale, wherein they discussed Varriale's activities the night before, his knowledge of the alleged victim, and Detective Wood's further investigation of the matter.

As noted above in the Investigative Report, Detective Wood used a digital voice recorder to make an audio recording of his interview with Varriale. The recording begins, however, after the point in time when Varriale consented to have the conversation recorded, and begins with Detective Wood reiterating their earlier conversation and confirming that Varriale understood that he was not under arrest and was not obligated to talk to him. The audio recording sheds no light on how Detective Wood characterized the nature of the investigation to Varriale originally.

Regrettably, the Circuit Court judge presiding over Varriale's suppression hearing prevented Detective Wood from developing the circumstances more fully through his testimony. During Detective Wood's direct examination, the following transpired:

[Detective Wood]: They had a subject found in a tent in that wooded area who identified himself as George, so I wanted to talk to the subject and, you know, still it's very earlier [sic] in the investigation. I'm trying to figure out what's going on, you know, he's located as a possible subject.

So when I arrived, I had all officers but one be there. I did have one officer with me just for officer's safety, I guess routine, and I identified myself to the George subject and basically formed on what little I had, and (indiscernible) for him to talk to me.

THE COURT: Let me ask you a question.

[Detective Wood]: Yes.

Varriale if he would consent to a search of his person. Detective Wood read then to Varriale a document entitled "Anne Arundel County Police Consent to Search Person Form" ("Consent Form") and placed a completed Consent Form in front of him for his signature. In pertinent part,[3] the Consent Form stated:

> Case #: <u>12-725920</u>[4]
> Date:   <u>7-10-12</u>

---

(…continued)

> THE COURT: His case, the relevance, Counsel, of the [2012] incident is just how they came in possession of the DNA sample, correct?
>
> [Prosecution]: Yes.
>
> THE COURT: Okay. We're in no need of going to any great detail on this event, are we?
>
> [Prosecution]: No. Well, I intended to—the issue is, I believe, is consent.
>
> . . .
>
> THE COURT: Can we stipulate to anything here so that we can get the detective back to bigger and better things?

Discussion between the attorneys and the hearing judge ensued. Much later in the hearing, when the hearing judge turned his attention back to Detective Wood, he asked the witness two direct questions regarding a different factual issue and then dismissed the witness.

[3] *See* Maj. Slip Op. at 3 (reproducing the Consent Form in full).

[4] The underlined text reflects blanks on the document that were completed by hand. The remainder of the document appears to be a pre-printed form. Clearly, the investigation was of a specific alleged crime (indicated by a case number) that is highly unlikely to have been the cold case burglary occurring four years earlier.

I, <u>George Varriale</u>, do hereby consent to a search of my person for the purpose of furnishing evidence relating to one or more of the following:

[. . . Saliva . . . Penile Swabs . . .]

. . .

I realize that if I do consent to a body search, that any evidence found to be involved *in this investigation*, being conducted by the Anne Arundel County Police Department can be used in any future criminal prosecution.

(emphasis added). Varriale signed the form, cooperated in the obtention of the samples by an evidence technician, and had an extended conversation with Detective Wood about the events of the proceeding evening. In short order, Varriale was excluded as a source of DNA from the alleged rape, *see* Maj. Slip Op. at 4–7, and Detective Wood did not contact Varriale again after 10 July 2012.[5]

At the suppression hearing, Varriale argued that the State's DNA match evidence as to the much older burglary case should have been excluded on the grounds that subsequent use of his DNA profile to conduct a cold case comparison search of the DNA databank exceeded the scope of his consent and constituted therefore an unreasonable search in violation of his Fourth Amendment rights. *See* Maj. Slip Op. at 4–7. The Circuit Court judge denied Varriale's motion to suppress, *sans* explanation, findings of fact, or conclusions of law (not that such are required, but it is helpful often to understand what a trial judge is thinking, particularly in the context of a suppression ruling).

---

[5] As of the date when Varriale was excluded as a possible suspect in the rape investigation, his expectation of privacy as a citizen was restored to its full vigor. I will speak more to this status later. *See infra* Part II of this dissent.

On appeal of Varriale's conviction after entering a conditional guilty plea, the Court of Special Appeals conceded that Varriale "may not have unambiguously consented to the use of his DNA outside of the rape investigation," *Varriale v. State*, 218 Md. App. 47, 52–53, 96 A.3d 793, 796 (2014), and that "the consent form is not a model of clarity." *Varriale*, 218 Md. App. at 54, 96 A.3d at 797. The intermediate appellate court opined as follows:

> While the form states that Varriale's DNA "can be used in any future prosecution," the form does not clearly specify whether the State may use the DNA only in a "criminal prosecution" for the alleged rape that the police were actually investigating, as opposed to some other "criminal prosecution" that is entirely unrelated to the alleged rape. Because we must construe this ambiguity against the State as the drafter, we conclude that the consent form does not contain Varriale's consent to the use of his DNA in criminal prosecutions that are unrelated to the alleged rape.

*Id.* The intermediate appellate court concluded nonetheless that the ambiguity was "ultimately immaterial" because the State did not run afoul of the Fourth Amendment as it "had no obligation to obtain a warrant before reexamining the DNA sample that it had lawfully obtained." *Varriale*, 218 Md. App. at 53, 96 A.3d at 796; *see id.* at 55, 96 A.3d at 797.

The thrust of the Majority's reasoning here hangs on its threshold determination that Varriale did not place an "express limitation" on his consent. *See* Maj. Slip Op. at 2 ("[W]e shall hold that, where Varriale's consent to search was not expressly limited by him, by the State, or by law, the Fourth Amendment does not preclude the State from storing and using his voluntarily provided DNA sample and resultant DNA profile for

additional, unrelated criminal investigations."), 9, 15, 18, 18 n.9, 19 ("Therefore, absent an express limitation placed on the use or storage of the DNA evidence by Varriale, the State, or by law, we cannot conclude that it was unreasonable for the State to maintain and utilize Varriale's DNA for subsequent unrelated investigations."), 19, 24, 25. In interpreting the Consent Form signed by Varriale, the Court majority reasons that it

> demonstrates neither an express limitation on the permitted use of the DNA evidence nor an express consent to any future use. Indeed, the form does not specify what the State would do with the DNA evidence once it was collected (namely, that it would retain the DNA profile and upload it to the LDIS). Unlike the Court of Special Appeals, however, we do not conclude that the form should be construed against the State to mean that there was no consent to the subsequent use and analysis of Varriale's DNA.

Maj. Slip Op. at 15. The Majority proceeds then to apply the United States Supreme Court's "'objective' reasonableness" test, as set out in *Florida v. Jimeno*, 500 U.S. 248, 251 (1991), to measure the scope of Varriale's consent: "[W]hat would the typical reasonable person have understood by the exchange between the officer and the suspect?" *See* Maj. Slip Op. at 15. The Majority concludes, applying the *Jimeno* test, that

> [l]ooking at the totality of the circumstances of this case, we cannot conclude that the lawful use of Varriale's DNA was limited only to the rape investigation. It is undisputed that Varriale made no express limitation indicating that his consent was limited to or conditioned upon the DNA evidence being used exclusively in the rape investigation.

Maj. Slip Op. at 18.

The Majority's assessment of the scope of Varriale's consent, in my view, is so far removed from the reality of what a typical reasonable person would have believed, based

7

on the totality of the circumstances in this case, as to boggle the mind of virtually any person-on-the-street in our State. A typical reasonable person, presented with the Consent Form at issue in this case, with a specific case number written on the top of the form identifying the aim and scope of the investigation as being a part of an ongoing, open rape investigation,[6] would assume that, indeed, the biological samples provided (and the DNA profile developed from the samples) would be used only in connection with the ongoing, open rape investigation. Furthermore, a reasonable person would understand the Consent Form to mean: "any evidence found to be involved *in this investigation*, being conducted by the Anne Arundel County Police Department can be used in any future criminal prosecution [of the alleged crime under investigation]." (emphasis added).

By its own terms and the circumstances of the encounter between Detective Wood and Varriale, Varriale's Consent Form limits the scope of the search (and its fruit) to use only in the rape investigation case ("this investigation") and any future criminal prosecution related thereto. When Varriale's DNA profile was compared to the DNA profile of the biological samples taken from under the alleged victim's fingernails, his sample was found to exclude him as a suspect in the rape investigation and the scope of consent reached its limit. After that failed comparison, however, Varriale's sample (during the automatic database search, *see* Maj. Slip Op. at 5–7) was compared to

---

[6] Most burglary investigations probably do not call for the collection of a penile swab, unless it is suspected that a penis was used as a burglary tool. In any event, this fact reinforces the notion that Varriale had every reason to believe it was only a rape allegation that was under active investigation.

evidence samples *not* "found to be involved in this [rape] investigation," to wit, every other sample from every unsolved crime for which there was a DNA sample entered into the LDIS suspect index; i.e., evidence from untold other investigations. A typical reasonable person would not understand Varriale's Consent Form to encompass such a continuation of the use of the fruit of his sample.

The Majority is wrong to conclude, therefore, that Varriale did not limit expressly the scope of his consent. Varriale limited the scope of his consent—the standard Consent Form provided to him by the Anne Arundel County Police Department limited expressly the scope of his consent by its own terms. Because the Majority misunderstands the appropriate scope of Varriale's consent, its Fourth Amendment analysis is flawed as well.

Even if the consent may be deemed not to be limited expressly to use of Varriale's biological samples (and resultant DNA profile) only in the rape investigation, I cannot endorse that the Court of Special Appeals and the Majority here appear to expect a homeless person living in the woods to be able to appreciate that he needs to re-negotiate the terms of the pre-printed Consent Form to specify that his biological samples may not be used to investigate any imaginable crime other than the one being investigated. This is beyond the ken of a typical lay person, even one who is not a homeless person living in the woods. Unless and until the Public Defender or private criminal defense attorneys open offices in the woods,[7] the Majority's standard, as applied in this case, represents an

---

[7] Or raccoons are accepted for matriculation in law schools.

unreasonable expectation of what a typical reasonable person in Varriale's shoes would know to do.

## II.    UNREASONABLE SEARCHES

Given the scope of Varriale's consent, the subsequent analysis and database comparison of Varriale's DNA profile with the DNA profiles associated with cold cases in Anne Arundel County is a separate search. On the facts of this case, this second search was an unreasonable one that violated Varriale's Fourth Amendment rights. The "match" resulting from further testing of his biological materials should have been suppressed.

The Fourth Amendment guarantees that "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures shall not be violated[.]" U.S. Const. amend. IV. Where an individual consents voluntarily to a search, that search does not violate his or her Fourth Amendment rights. *See* Maj. Slip Op. at 11–12 (discussing the standards for consent and "voluntariness"); *State v. Green*, 375 Md. 595, 609, 826 A.2d 486, 494 (2003) ("Where an individual's encounter with the police is purely consensual, 'no privacy interests [are] invaded and thus the Fourth Amendment is not implicated.'") (quoting *Ferris v. State*, 355 Md. 356, 375, 735 A.2d 491, 501 (1999)). Once a search goes outside the scope of consent, however, it becomes unreasonable. *See Jimeno*, 500 U.S. at 252 ("A suspect may of course delimit as he chooses the scope of the search to which he consents."); *Gamble v. State*, 318 Md. 120, 129, 567 A.2d 95, 100 (1989) ("'[A] consensual search may go no further than the limits' defined by the consent." (quoting *State v. Jensen*, 723 P.2d 443, 446 (Wash. App. 1986))); *Buckley v. State*, 797 N.E.2d 845, 849 (Ind. Ct. App. 2003) ("Because [consent

10

to search] comes within an established exception to the Fourth Amendment warrant requirement, the scope of the authority to search is strictly limited to the consent given, and a consensual search is reasonable only if it is kept within the bound of that consent."); *State v. Binner*, 886 P.2d 1056 (Or. App. 1994) (holding that a DNA sample taken for one purpose cannot be used subsequently for a different purpose without offending the Fourth Amendment); *see also* 4 LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 8.1(c) (8th ed. 2014) ("When the police are relying upon consent as the basis for their warrantless search, they have no more authority than they have apparently been given by the consent.").

Varriale consented for his DNA profile to be compared only to the DNA profile gleaned from the fingernail scrapings of the alleged rape victim. Had the police recovered other biological materials from the victim of the alleged crime scene of the rape, comparison of that with Varriale's DNA profile would have been fair game under the consent given here. The further DNA comparison, achieved by searching LDIS, was outside, however, the scope of Varriale's consent. Once outside the scope of consent, the far-ranging comparison search became a warrantless second search. "[W]e look at any DNA collection effort as two discrete and separate searches. The first search is the actual swab of the inside of [the suspect's] mouth and the second is the analysis of the DNA sample thus obtained, a step required to produce the DNA profile." *King v. State*, 425 Md. 550, 594, 42 A.3d 549, 575 (2012), *rev'd*, *Maryland v. King*, 569 U.S. ___, ___, 133 S. Ct. 1958, 1980 (2013) (determining that, under the specific circumstances of the case, the second search was reasonable); *see Raynor v. State*, 440 Md. 71, 98, 99 A.3d 753,

11

769 (2014) (Adkins, J., dissenting) ("As I see it, two distinct events happened in this case that raise Fourth Amendment concerns. The first is the State's collection of Raynor's DNA from the police station chair after inviting him to the station for questioning, as which time he refused to submit to DNA testing. The second is the analysis and submission to the CODIS database of the DNA."); *see also United States v. Mitchell*, 652 F.3d 387, 407 (2011) ("The second 'search' at issue is, of course, the processing of the DNA sample and creation of the DNA profile for CODIS. This search also has the potential to infringe upon privacy rights.").

As the Majority points out, in *Raynor*, 440 Md. 71, 99 A.3d 753, this Court held that "once the state lawfully possessed a suspect's DNA, subsequent testing of that DNA does not amount to a Fourth Amendment search," to wit, the State collected lawfully biological materials discarded by a suspect in his perspiration on a chair in the police station. Maj. Slip Op. at 20. I conclude, however, under the *Katz* test, that subsequent testing *does* amount to a Fourth Amendment search in the consent context of the present case.

The *Katz* test, from Justice Harlan's concurrence to *Katz v. United States*, 389 U.S. 347 (1967) (Harlan, J., concurring), remains the "lodestar for determining whether police conduct is a search for purposes of the Fourth Amendment." *Raynor*, 440 Md. at 83, 99 A.3d at 759. The *Katz* test invokes a twofold analysis to decide what is protected under the Fourth Amendment. The first is that the person needs to have exhibited an actual (subjective) expectation of privacy, and the second, that the expectation be one that

society is prepared to recognize as reasonable. *Katz*, 389 U.S. at 361 (Harlan, J., concurring).

Every person should be presumed to start with an actual expectation of privacy in his or her DNA, although the vigor of that expectation may be diminished in those with a prior criminal record. DNA is not collected for employment purposes (like fingerprints are for some forms of employment). It is not recorded by the government at birth, at the issuance of a driver's license, or at any point during a citizen's life *except* in the investigation of a crime.[8] DNA differs from fingerprints in the sheer wealth of information it contains.[9] *See King*, 425 Md. at 595, 42 A.3d at 576 ("We do not embrace wholly the analogy between fingerprints and DNA samples advanced in Judge Raker's concurring opinion in [*State v. Raines*, 383 Md. 1, 857 A.2d 19 (2004)] and by the State

---

[8] DNA may be recorded collected and recorded also during diagnostic medical procedures, like genetic testing, but the courts have made it abundantly clear that DNA medical testing is different than DNA testing done by the police. *See Maryland v. King*, 569 U.S. ___, ___, 133 S. Ct. 1958, 1966–67 (2013) (determining that the DNA used for forensic DNA testing "does not show far reaching and complex characteristics like genetic traits"); *id.* at ___, 133 S. Ct. at 1968 (noting that the CODIS loci are not "known to have any association with a genetic disease or any other genetic predisposition. Thus, the information in the database is only useful for human identity testing"). The DNA discussed here is simply that thought-to-be unimportant DNA that marks you as completely unique from virtually any other human on the planet.

[9] The Majority, like many other courts, insists that DNA and fingerprints are identical essentially. *See* Maj. Slip Op. at 15–16. The Supreme Court, in *King*, found that to be true in the case of arrestees, felons, and parolees, who already have a diminished expectation of privacy, and when there is a compelling government interest at play. I am disinclined to extend the Supreme Court's reasoning to those who are not suspected of a crime (as was the situation of Varriale after he was excluded as a person of interest in the rape investigation) when the government has no legitimate interest that warrants intrusion.

13

in the present case. As aptly noted, fingerprints are a physical set of ridges on the skin of a person's fingers that, when exposed to ink (or other medium) and the resultant imprint placed on paper or electronic records, can determine usually and accurately a person's identity by matching the physical characteristics to a known set of fingerprints. DNA, on the other hand, is contained within our cells and is collected by swabbing the interior of a cheek (or blood draw or otherwise obtained biological material)."), *rev'd*, 569 U.S. ___, 133 S. Ct. 1958; *see id.* at 595–96, 42 A.3d at 576–77 ("The information derived from a fingerprint is related only to physical characteristics and can be used to identify a person, but no more. A DNA sample, obtained through a buccal swab, contains within it unarguably much more than a person's identity."); *Raynor*, 440 Md. at 103, 99 A.3d at 771–72 (Adkins, J., dissenting) ("DNA has the potential to reveal enormous amounts of private information about a person. With today's technology, scientists have the power to discern genetic traits, behavioral tendencies, propensity to suffer disease or defects, other private medical information and possibly more."). DNA differs also from fingerprints because the acquisition of a biological sample sufficient to garner a DNA profile requires a comparatively greater intrusion into one's body. Because DNA is harder to collect and analyze and is not "collected" routinely by the government in the same manner as fingerprints, people still maintain an expectation of privacy interest in their DNA.[10, 11]

---

[10] Although the State, as of now, does not have the ability (without a warrant) to test for personal medical information, it still has access to material that contains that information. As courts become increasingly relaxed about DNA testing, citizens may fear that one day

(Continued…)

14

their medical information will be accessible. After all, as the United States Supreme Court points out in *King,* technology is improving quickly. The Supreme Court noted that "the FBI has already begun testing devices that will enable the police to process the DNA of arrestees within 90 minutes." *King*, 569 U.S. at ___, 133 S. Ct. at 1977. This technological increase in speed leads one to believe reasonably that the same technology will make processing of medical records to become more readily available and faster as well. "[W]e cannot turn a blind eye to the vast genetic treasure map that remains in the DNA sample retained by the State." *King*, 425 Md. at 596, 42 A.3d at 577, *rev'd*, *King*, 569 U.S. ___, 133 S. Ct. 1958.

Another potential fear is that a State or local law enforcement database containing DNA profiles could be hacked and persons unfettered by statutory limitations on the use of the data by law enforcement will have access to one's unique identity or one's medical information. The fear that the database will be hacked is not so futuristic, given current events. *See, e.g.*, Ken Dilanian & Ted Birdis, *Officials: Second Hack Exposed Military and Intel Data*, Associated Press, June 12, 2015, *available at* http://bigstory.ap.org/article/d842d757851b4a59aca2aecf2f31995a/union-says-all-federal-workers-fell-victim-hackers; *AP Source: Cardinals Allegedly Hack Astros Player Database*, June 16, 2015, USA Today, *available at* http://www.usatoday.com/story/sports/mlb/2015/06/16/ap-source-cardinals-allegedly-hacked-astros-player-database/28816387/; Patricia Zengerle & Megan Cassella, *Millions More Americans Hit by Government Personnel Data Hack*, June 16, 2015, Reuters, *available at* http://www.reuters.com/article/2015/07/09/us-cybersecurity-usa-idUSKCN0PJ2M420150709. Although the Supreme Court says it need not speculate about the risks posed by a system that "did not contain comparable security provisions," *King*, 569 U.S. at ___, 133 S. Ct. at 1980 (internal quotation omitted), given the attributions to and projections about technological advances, due speculation is warranted also to technological weaknesses and the consequences resulting therefrom. It is cause enough for fear for someone to have your social security number, which is issued by the federal government. The fear would be untold if the information contained in your DNA was in someone else's hands, especially if you are unaware the State has uploaded the DNA profile to databases that are more attractive to hackers, foreign or domestic.

[11] The Majority relies on the analogy between DNA and fingerprints to support its opinion. The Majority, as do a number of other courts, concludes that DNA is another booking procedure like fingerprinting, *see* Maj. Slip Op. at 15–16, even though fingerprint collection has not "undergone definitive Fourth Amendment scrutiny." *King*, 425 Md. at 596, 42 A.3d at 577, *rev'd*, 569 U.S. ___, 133 S. Ct. 1958; *see King*, 569 U.S. at ___, 133 S. Ct. at 1988 (Scalia, J., dissenting) ("The 'great expansion in fingerprinting came before the modern era of Fourth Amendment jurisprudence,' and so we were never asked to decide the legitimacy of the practice." (quoting *United States v. Kincade,* 379

(Continued…)

15

In *United States v. Davis*, 690 F.3d 226 (4th Cir. 2012), the United States Court of Appeals for the Fourth Circuit found that the defendant maintained a privacy interest in his DNA when it was collected from his clothes. Davis went to the hospital for a gunshot wound, which he claimed resulted from being shot by a robber. *Davis*, 690 F.3d at 230. The officers that investigated Davis's claim took his blood-soaked clothes and stored them in evidence in case they needed them during the investigation of the alleged robbery. *Id.* Investigating police decided to investigate Davis further, based on their conversations with him at the hospital. *Id.* The officers found marijuana in Davis's car and arrested him on drug charges, which were dropped later. *Id.* The initial robbery investigation was not pursued and charges were not brought. *Id.* Davis's bloody clothes were logged into evidence on the same sheet that connected Davis to the marijuana. *Davis*, 690 F.3d at 231. At that point, Davis was both a victim and an arrestee. *Id.* His DNA, however, was on items that pertained to his status as a victim. *Id.* Later, Michael Neal was murdered and Davis became a suspect. *Id.* His clothes from the earlier events were still in the evidence room of the Howard County Police Department. *Id.* The police took the clothes from when Davis was shot and, without a warrant, created a DNA profile from the blood, compared it to DNA found at the Neal murder crime scene, and discovered that Davis did not match the DNA from the Neal murder crime scene. *Id.* Nonetheless, the police entered then Davis's DNA profile into their local DNA database.

(…continued)
F.3d 813, 874 (9th Cir. 2004) (Kozinski, J. dissenting)). *But cf. King*, 133 S. Ct. at 1976–77 (majority opinion) (discussing fingerprinting as a form of identification).

*Id.* The general comparison search of Davis's DNA profile with DNA profiles connected to "cold cases" in the local DNA database resulted in a "hit" to a different robbery and murder crime scene. *Davis*, 690 F.3d at 232. As a result of the hit, Davis was arrested. *Id.*

The *Davis* Court found that "a person who is solely a crime victim does not lose all reasonable expectation of privacy in his or her DNA material simply because it has come into the lawful possession of the police." *Davis*, 690 F.3d at 244. In particular, the *Davis* court notes that, although sister courts recognize that "the Constitution allows the collection of DNA samples," they "uniformly recognize" also that "persons who have not been arrested have a greater privacy interest in their DNA that persons who have been arrested." *Id.* The Fourth Circuit's reasoning in *Davis* between the different accorded privacy interests in DNA between an innocent person and an arrestee is compelling. Varriale was not an arrestee and had the fullest scope of the Fourth Amendment's protections available to him, as did Davis as a victim.

Varriale exhibited an actual (subjective) expectation of privacy. His consent reduced temporarily, and in limited fashion, his reasonable expectation of privacy to the testing of his DNA in an effort to eliminate police suspicion regarding the rape allegation[12]; his consent did not forego suddenly, and forevermore, any privacy interest in

---

[12] In *Fernandez v. California*, 571 U.S. ___, 134 S. Ct. 1126 (2014), the Supreme Court found that a homeowner's consent to search her house is valid, even if the other occupant objects, if the objecting owner is absent. One reason that a homeowner may consent to have their house searched even if the police could not obtain a warrant, the Court supposed, was that the owner believed he or she was under suspicion: "Where the owner

(Continued…)

his DNA.[13]  "Even an arrestee, who has a diminished expectation of privacy, does not forfeit forever all privacy interest in his effects."  *Davis*, 690 F.3d at 243.  Furthermore, once he was excluded as the source of DNA found under the victim's fingernails, his full expectation of privacy was re-established.[14]

Not only does the Majority refuse to recognize the actual expectation of privacy that Varriale had in his DNA profile upon exclusion as a possible suspect in the rape investigation, the Majority shies away further from recognizing outright that the second comparison search of LDIS was, indeed, a search, and discusses at length why it is not a

---

(…continued)

believes that he or she is under suspicion, the owner may want the police to search the premises so that suspicions are dispelled."  *Fernandez*, 571 U.S. at ___, 134 S. Ct. at 1132.  Surely, we cannot imagine that this means the State may enter the home at any time after that initial search consent; rather, we would demand that the police obtain consent for each and every subsequent search.  We would not find it reasonable that one instance of consent, designed to remove suspicion and help the police narrow their search to appropriate suspects, means the owner has given up forever his or her privacy interest in the home.  To say otherwise would bestow on the police the same power Bram Stoker gave to Dracula and his brethren—once invited over the threshold, they may enter at any time thereafter.

[13] From the Majority's reading of what it takes for a person to exhibit an actual (subjective) privacy expectation in his or her DNA profile, Varriale might have been expected to wear a HazMat suit to ensure that his DNA could not land anywhere unintended.

[14] We offer this status to those who are: arrested, but have the charges dropped; tried actually, but not convicted; those whose conviction is reversed or vacated, and no new trial permitted; or the individual granted an unconditional pardon.  *See King*, 569 U.S. at ___, 133 S. Ct. at 1967.  It would be unreasonable to think we do not offer that same protection to someone who is never even arrested.

18

search, but a *use*.[15]  *See* Maj. Slip Op. at 19–22.  The reason, I suspect, the Majority rests its legal opinion on the scope of consent issue,[16] as opposed to the DNA as a search issue,

[15] The Majority looks to the reasoning of several other courts to support its conclusion that a reasonable person would understand that, upon giving voluntarily a DNA sample without an express limitation on the use of that sample, his or her DNA profile would be retained forever by the State and, in weekly automatic searches, compared to DNA samples collected from crime scenes.  *See* Maj. Slip Op. at 5–6, 15–18.  The Majority's reliance on some of these cases is flawed.  To the extent that the Majority relies on the similarity of fingerprints and DNA to justify the search, Maj. Slip Op. at 15–16, that is addressed above, *supra* at p.14.

The Majority relies heavily on *Commonwealth v. Gaynor*, 820 N.E.2d 233 (Mass. 2005).   *See* Maj. Slip Op. at 16–17.  The discussion in *Gaynor* is based on the interpretation of a consent form.  Because the *Gaynor* Court interprets the consent form in the same way that the Majority interprets Varriale's consent form, they agree on the expectation a reasonable person would have.  Since I find that interpretation incorrect, *see supra* Part I of this dissent, I find that a reasonable person would not have concluded what the *Gaynor* Court and the Majority believes they would have.

The Majority relies next on *People v. Collins*, 250 P.3d 668 (Colo. App. 2010). *See* Maj. Slip Op. at 17–18.  The facts of this case are starkly similar to *King*.  Colorado police matched ultimately Collins's DNA to the DNA left on a rape victim.  *Collins*, 250 P.3d at 672.  Collins had been under investigation initially for a robbery in Missouri. *Collins*, 250 P.3d at 671.  Police in Missouri believed they could connect Collins to the robbery through DNA.  *Id.*  He consented to have his DNA tested.  *Id.*  Collins's DNA matched the DNA the police obtained from the crime scene, as well as DNA from another Missouri crime scene that involved a home invasion and sexual assault.  *Id.*  The Missouri police noted that Collins had a Colorado arrest record and forwarded his DNA profile to the Colorado police.  *Collins*, 250 P.3d at 672.  It was found that Collins's DNA matched the DNA found on a rape victim in 1999.  *Id.*  Although this case was decided four years before *King*, now that *King* has been decided, the jurisprudential value of *Collins* should be analyzed in light of *King*.  *Collins* involved an arrestee: his DNA could be collected and his criminal history determined and ascertained as a part of getting the full picture of the arrestee's identity.  Pursuant to *King*, running the arrestee's DNA through a cold-case database is not a Fourth Amendment violation because of the legitimate government interest and the arrestee's diminished privacy rights.

*Collins* does not inform us, however, about the proper outcome of the present case. The Majority's use of *Collins* as support that once the defendant gave his consent, he should have expected it would be used in any other case, presents two problems.  First, there was no written agreement, but an oral one, between the police and Collins.  The exact conversation is not discussed in the *Collins* opinion.  So, we cannot analyze any

(Continued…)

is because the United States Supreme Court's holding in *King*, 569 U.S. ___, 133 S. Ct. 1958, supports the notion that subsequent DNA testing is a search. The holding in *King* is a narrow one and is based on the idea that DNA collection *and analysis* is a search. The United States Supreme Court held:

> When officers make an arrest supported by probable cause to hold for a serious offense and they bring the suspect to the station to be detained in custody, taking and analyzing a cheek swab of the arrestee's DNA is, like fingerprinting and photographing, a legitimate police booking procedure that is *reasonable under the Fourth Amendment*.

569 U.S. at ___, 133 S. Ct. at 1980 (emphasis added). This does not mean that DNA analysis and comparison is not a search, only that, in the narrow factual context of an arrestee involved in a police booking procedure, it is a *reasonable* search.[17]

---

(…continued)
potential differences between concepts of consent in Missouri and Maryland. Second, Collins's DNA was matched to the crime for which he was suspected—the robbery. In light of *King*, we should not look here to *Collins* for guidance because the *King* decision renders moot the exact legal discussion of the scope of the arrestee's consent. The only value for which the Majority may depend on *Collins* is its analysis that the Court took the defendant's lack of express limitation on the scope as evidence of no limitation, and that the police do not have to inform the suspect that the DNA will be used in subsequent investigation. These issues go directly to scope of consent, and were addressed in the first Part of this dissent.

[16] If the subsequent comparison with all the "cold-case" samples in LDIS is not a search, it does not matter where Varriale's consent ended.

[17] The Fourth Amendment is only applicable when dealing with the right of the people against unreasonable search and seizure. The Supreme Court concluded that a buccal swab is a search. *King*, 569 U.S. at ___, 133 S. Ct. at 1969. The State also has the right to search (in the form of a buccal swab) the person of the accused when legally arrested. *See King*, 569 U.S. at ___, 133 S. Ct. at 1970. A buccal swab, however, does not give the State the identity of the person, unless it is analyzed, a profile created, and samples

(Continued…)

20

*King* offers little further assistance in the present case. The biological samples obtained from Varriale were not taken during an arrest. They were not taken pursuant to a police booking procedure. They were not taken in order to identify the giver of the samples as the correct pretrial defendant or for a pretrial custody decision. *See King*, 569 U.S. at ___, 133 S. Ct. at 1980. Varriale's identity was known fully as one who consented voluntarily in an effort presumably to exclude himself from suspicion of an alleged rape.[18] The compelling government interest of identification that made the further DNA search through CODIS reasonable in *King* does not exist here.

In *Raynor*, the Majority found that analysis by the police of the 13 identifying so-called "junk" loci is not a search under the Fourth Amendment when the biological sample was abandoned in perspiration on a chair in a police station. *Raynor*, 440 Md. at 75, 99 A.3d at 755. The DNA analysis in that holding was a single comparison of Raynor's DNA profile with that of the DNA profile extracted from biological materials left on the rape victim. *Raynor*, 440 Md. at 76–77, 99 A.3d at 756. *Raynor*'s holding is of limited applicability to the case at bar, which deals not with the single comparison, but

___

(…continued)
compared. It is that comparison of the subject profile with other DNA profiles derived from other biological samples that gives the State an individual's identity (identity being the legitimate government interest in play in *King*). If identity is the product of the search, then the search is not just obtaining the buccal swab, but the analysis and comparison of its contents.

[18] Varriale was not arrested and was not going to be processed, charged, or tried. The reasons that justify a subsequent search for identification purposes (one who has been arrested, who is being tried, and the criminal history to discover other offenses, or a record of violence or mental disorder, *King*, 569 U.S. at ___, 133 S. Ct. at 1971–72), do not exist in this case.

21

with a generalized, far-sweeping search of all DNA profiles in a cold case database. If, as in *Raynor,* the person is matched to the DNA profile of the initial qualifying case, and then arraigned, any subsequent DNA cold-case comparison will be determined by application of the Supreme Court's decision in *King.* But that is not the case here. Varriale (the person of interest) was excluded as the source of the DNA found on the victim as a result of the initial comparison. The subsequent comparison search of Varriale's DNA profile in LDIS does not fall under *King.* As the *Raynor* court did not discuss the topic of general cold-case "fishing" investigative searches, *Raynor* does not provide the legal support for its conclusion that the Majority believes it does.

The Majority finds that the comparison search of the LDIS database of DNA profiles associated with cold cases cannot be a search because a person does not retain privacy rights once the police have obtained "lawfully" a DNA profile. *See* Maj. Slip Op. at 20. The Majority finds support for its decision in several cases, but those cases all have factual backgrounds that differ significantly, and do not lend strength to the Majority's conclusion. In all of those cases, the defendants had their DNA collected because they were being booked for other crimes, which they had committed.[19] When an

---

[19] The Majority focuses primarily on *Wilson v. State*, 132 Md. App. 510, 752 A.2d 1250 (2000). Maj. Slip Op. at 23–24. In that case, a blood sample from Wilson was collected pursuant to a warrant in connection with a 1991 rape investigation. *Wilson*, 132 Md. App. at 531–32, 752 A.2d at 1262. A DNA profile was not developed, however, because the victim made a positive identification of someone else during a police lineup in which Wilson participated. *Id.* When Wilson was suspected of committing a rape in 2000, the police obtained a warrant for his DNA. *Id.* When they re-discovered they had his DNA on file, however, they tested the DNA sample that they had stored from the previous rape

(Continued…)

22

investigation, rather than execute the warrant. *Id.* They did not run it against every cold case in the jurisdiction, as here, however; they performed basic analysis of two samples.

Notwithstanding the *Wilson* court's belief that, once DNA is in lawful police possession, no further Fourth Amendment intrusion occurs, I note that the Maryland DNA Collection Act makes clear that a DNA sample and profile must be destroyed if the individual is not convicted of a qualifying crime or if the original charges are dropped. Md. Code (2003, 2008 Repl. Vol, 2014 Cum. Supp.), Public Safety Article ["PS"] § 2-504(d)(2). The very inclusion of this provision implies to me that the Legislature found something uneasy (and perhaps unconstitutional) about keeping the DNA sample of that class of persons enumerated in the Md. DNA Collection Act: those for whom (a) qualifying criminal charges are determined to be unsupported by probable cause; (b) criminal action was begun against the individual relating to the crime but did not result in a conviction of the individual; (c) the conviction was finally reversed or vacated and no new trial was permitted; or, (d) the individual was granted an unconditional pardon *See* PS § 2-504(d)(2), § 2-511(a)(1)(i), (ii), and (iii). Although I admit Varriale does not fall under the Maryland DNA Collection Act, if a person arrested on probable cause has the right to have his or her DNA profile destroyed, why not the person who is not arrested and who is never charged with a qualifying crime? As Justice Scalia foretold, "the [Maryland DNA Collection] Act manages to burden uniquely the sole group for whom the Fourth Amendment protections ought to be most jealously guarded: people who are innocent of the state's accusations." *King*, 569 U.S. at ___, 133 S. Ct. at 1989 (Scalia, J., dissenting).

The Majority relies also on *Washington v. State*, 653 So.2d 362 (Fla. 1994). Maj. Slip Op. at 26 n.13. In that case, the DNA was not run through a database. The defendant's DNA was collected for his suspected involvement in an assault. *Washington*, 653 So.2d at 363–64. He was suspected also in another crime (a murder). *Id.* The police compared his DNA, obtained in connection with the assault case, to the DNA found at the murder scene. *Id.* Thus, this was not a cold case search of a person not suspected of a crime through all databases. This search is permitted under *King*, but does not provide guidance in the present case.

In addition, the Majority relies on *State v. Hauge*, 79 P.3d 131 (Haw. 2003). Maj. Slip Op. at 26 n.13. Again, DNA was collected through a warrant in a robbery case investigation. *Hauge*, 79 P.3d at 135. The DNA collected pursuant to the warrant was compared to blood found at another crime scene in which the defendant was also a suspect. *Id.* This situation is similar to *Raynor* or *King*. Thus, *Hauge* did not involve a broad search as occurred in present case.

The Majority's reliance on *Smith v. State*, 744 N.E.2d 437 (Ind. 2001), is the most apt of the lot. *See* Maj. Slip Op. at 26 n.13. In that case, a defendant was accused of rape and suspected in a second rape. *Smith*, 744 N.E.2d at 438–39. He was acquitted of the first rape, but his DNA was run through the database. *Smith*, 744 N.E.2d at 439. It

(Continued…)

23

individual has been arrested for probable cause, that individual does have diminished privacy rights, as either an arrestee, or in some cases, an incarcerated person. *Raynor*, 440 Md. at 97–98, 99 A.3d at 768 (Adkins, J., dissenting). Biological samples may be collected, DNA profiles obtained, and comparison searches may be done for the purpose of identification, and the search will be deemed likely reasonable.

---

(…continued)
should be recognized that, in Maryland, the biological sample and DNA profile obtained therefrom would have been destroyed after the acquittal. *See* PS § 2-511(a)(1)(i). Had it not been destroyed, but instead run through a database, the results would have been suppressed and the employee who ran it would have been found likely in violation of the Maryland DNA Collection Act. PS § 2-504 (d)(2). This would have followed in order to protect a suspect who is not convicted of a qualifying crime.

The Majority relies next on *State v. Bowman*, 337 S.W.3d 679 (Mo. 2011). Maj. Slip Op. at 26 n.13. Bowman was convicted originally of two murders (though his conviction was later overturned and a new trial ordered). *Bowman*, 337 S.W.3d at 683. Bowman consented to have his DNA taken during the investigation of those murders. *Bowman*, 337 S.W.3d at 684. After Bowman's conviction was overturned, that DNA sample was then sent to another state for specific comparison with a crime where Bowman was a suspect. *Bowman*, 337 S.W.3d at 685. This is a specific case comparison, not the general database search as in the present case. Furthermore, although the DNA was tested after Bowman's conviction was overturned and he was on bail, *Bowman*, 337 S.W.3d at 695, this does seem to be the type of identification that the Supreme Court referred to in *King*. "Even if an arrestee is released on bail, development of DNA identification revealing the defendant's unknown violent past can and should lead to the revocation of his condition release." *King*, 569 U.S. at ___, 133 S. Ct. at 1974. Because Bowman was an arrestee with diminished expectation of privacy, and the type of identification there is a legitimate government interest, this case is in the same vein as *King*, but not the present case.

Finally, the Majority relies on *State v. Notti*, 71 P.3d 1233 (Mont. 2003). Maj. Slip Op. at 26 n.13. The DNA comparison in *Notti* very clearly tracks *King*. The suspect was convicted, and after his conviction, his DNA profile was run through CODIS and matched to DNA left at a murder scene. *Notti*, 71 P.3d at 1235. Again, this is not the situation in play here. To rely on this case to support the conclusion that a subsequent CODIS search is not a search, but rather a "use," is incorrect. The search occurred, but was deemed reasonable.

It is clear from today's opinion that the Majority is not entirely in touch with what most of the people deem reasonable. I find it hard to imagine that society-at-large would find it unreasonable that a person believes he or she has a privacy right in his or her DNA. More precisely, society would find it reasonable that a person, who gave up voluntarily a biological sample and was excluded as a possible source of DNA recovered from the body of an alleged rape victim, had, from the moment of exclusion as a suspect, a re-established privacy right, in full vigor, in his or her DNA.

Without a warrant (or an exception to the warrant requirement), in order for the further LDIS search to be lawful, "it must be supported by reasonable, articulable suspicion." *Ferris*, 355 Md. at 384, 735 A.2d at 506. This requires the State to "'be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.'" *Id.* (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968)).

In this case, no rationale that warrants a further intrusion into Varriale's DNA profile or "identity" exists once the County excluded Varriale as a source of the biological materials recovered from under the fingernails of the alleged rape victim. After Varriale was excluded as a possible perpetrator, there were no facts to support supposition that Varriale committed any crime. There was no specific reasonable inference any member of the rape investigatory team could have articulated (or did articulate) that would provide the State with reasonable suspicion to run a separate search using his DNA profile, much less connect him to an unsolved commercial burglary committed four years earlier. "No matter the degree of invasiveness, suspicionless

25

searches are *never* allowed if their principle end is ordinary crime-solving." *King*, 569 U.S. at ___, 133 S. Ct. at 1982 (Scalia, J., dissenting).

"The Fourth Amendment forbids searching a person for evidence of a crime when there is no basis for believing the person is guilty of the crime or is in possession of incriminating evidence. That prohibition is categorical and without exception." *King*, 569 U.S. at ___, 133 S. Ct. at 1980 (Scalia, J., dissenting). Never has the Supreme Court "indicate[d] approval of a search whose primary purpose was to detect evidence of ordinary criminal wrongdoing. That limitation is crucial. It is only when a governmental purpose aside from crime-solving is at stake that we engage in the [] reasonableness inquiry . . . ." *King*, 569 U.S. at ___, 133 S. Ct. at 1981–82 (Scalia, J., dissenting) (internal citations omitted). In this case, the only government purpose for running this search was general crime-solving. That is not a legitimate government interest that warrants the violation of the Fourth Amendment.

The "traditional standard of reasonableness requires a court to weigh the promotion of legitimate governmental interests against the degree to which the search intrudes upon an individual's privacy." *King*, 569 U.S. at ___, 133 S. Ct. at 1970 (majority opinion) (internal quotations omitted). Varriale's DNA profile was protected by the guarantees of the Fourth Amendment from a subsequent cold-case database search after he was excluded as the source of the DNA recovered from the alleged rape victim. He had from that point the full privacy rights in his DNA that any other free citizen does. "Although we recognized (and no one can reasonably deny) that solving cold cases is a legitimate government interest, a warrantless, suspicion less search cannot be upheld by a

26

'generalized interest' in solving crimes." *King*, 425 Md. at 598, 42 A.3d at 578, *rev'd*, 569 U.S. ___, 133 S. Ct. 1958. "Solving unsolved crimes is a noble objective, but it occupies a lower place in the American pantheon of noble objectives than the protection of our people from suspicion less law-enforcement searches." *King*, 569 U.S. at ___, 133 S. Ct. at 1989 (Scalia, J., dissenting). The second search was unreasonable.

In the dissent to *Raynor*, Judge Adkins wrote "the majority's opinion will likely have the consequence that many people will be reluctant to go to the police station to voluntarily provide information about crimes for fear that they, too, will be added to the CODIS database."[20] 440 Md. at 108–09, 99 A.3d at 775 (Adkins, J., dissenting). If the Majority opinion in *Raynor* did not diminish a free person's desire to assist the police, today's decision will certainly. After today's ruling, those who consent[21] to the taking of their biological materials, in an effort to help the police, will face a certain knowledge

---

[20] Other than Raynor, approximately 20 other men consented to have their DNA taken by the police to be compared to the crime scene sample. *Raynor v. State*, 440 Md. 71, 76, 99 A.3d 753, 755 (2014). Given today's case, one can only imagine how many of those men (or any other individual who consents to a DNA swab expecting it to clear himself or herself) had their DNA profile run through LDIS, or how many of their DNA profiles are still in police possession. If you were to ask them, I imagine they would be startled to know the police not only may have kept their DNA profile, but could run it through a cold-case database, and continue to do so as often as the police please. Nevertheless, the Majority claims a reasonable person would expect such. *See* Maj. Slip Op. at 5-6, 18–19.

[21] Unfortunately, there will be likely many more cases to come in which the DNA profile of an unsuspecting consenting citizen (be he or she a volunteer, such as Varriale, or a victim, such as the alleged victim in this matter or a victim of a shooting, *see supra* (discussing *United States v. Davis*, 690 F.3d 226 (4th Cir. 2012)) is uploaded to a database of DNA profiles and compared regularly with past and future unsolved crimes. Today's Majority opinion is just a hop, skip, and a jump away from the Court licensing potential future police practice of, on a whim, running a victim's DNA profile through LDIS, on a "flyer."

27

that, even if not suspected or convicted of a crime, the police can, and will, hold on to their DNA profile forever, and may compare it at any time for any or no articulable reason.

In light of the Majority's opinion (and the potential future consequences), the time may be nigh for the enactment of additional legislation or regulations governing the collection and maintenance of DNA within local law enforcement databases to protect individuals such as Varriale, whose DNA is not otherwise protected by the Maryland DNA Collection Act.

I would reverse the judgment of the Court of Special Appeals in the present case and remand the case to the intermediate appellate court with directions to reverse the judgement of the Circuit Court for Anne Arundel County and remand the case to the Circuit Court for further proceedings.

Judge Adkins authorizes me to state that she joins the views expressed in this dissent.